UNITED STATES BANKRUPTCY COURT
DISTRICT OF THE VIRGIN ISLANDS

IN RE:                          . Case No. 06-30008(JKF)
                                . (Jointly Administered)
INNOVATIVE COMMUNICATION        .
COMPANY, LLC,                   .
                Debtor.         .
. . . . . . . . . . . . . . . . Case No. 06-30009(JKF)
IN RE:                          .
                                .
JEFFREY J. PROSSER,             .
                Debtor.         .
. . . . . . . . . . . . . . . . Case No. 07-30012(JKF)
IN RE:                          .
                                .
INNOVATIVE COMMUNICATION        .
CORPORATION,                    .
                Debtor.         .
. . . . . . . . . . . . . . . . Adv. Case No. 07-03010(JKF)
IN RE:                          .
                                .
STAN SPRINGEL, COURT-APPOINTED  .
TRUSTEE OF INNOVATIVE           .
COMMUNICATION CORPORATION,      .
                                .
                Trustee,        . USX Tower - 54th Floor
          v.                    . 600 Grant Street
                                . Pittsburgh, PA  15219
JEFFREY PROSSER, DAWN PROSSER,  .
JUSTIN PROSSER, MICHAEL J.      .
PROSSER, SYBIL G. PROSSER,      .
MICHELLE LaBENNETT, AND         .
LYNDON A. PROSSER,              .
                                . August 31, 2009
                Defendants.     . 9:17 a.m.
. . . . . . . . . . . . . . . .
TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:              Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311       Fax No. (609) 587-3599**

2

APPEARANCES:

| | |
|---|---|
| For Debtor Jeffrey<br>Prosser: | By: NORMAN ABOOD, ESQ.<br>203 Fort Industry Square<br>Toledo, OH  43604 |
| | Robert F. Craig, PC<br>By:  ROBERT F. CRAIG, ESQ.<br>      (telephonic appearance)<br>1321 Jones Street<br>Omaha, Nebraska 68102 |
| For Stan Springel,<br>Chapter 11 Trustee: | Vinson & Elkins LLP<br>By:  JAMES LEE, ESQ.<br>     MICHAELA CROCKER, ESQ.<br>     (telephonic appearance)<br>     DANIEL C. STEWART, ESQ.<br>     (telephonic appearance)<br>3700 Trammell Crow Center<br>2001 Ross Avenue<br>Dallas, TX  75201 |
| | STAN SPRINGEL<br>(telephonic appearance) |
| For Jim Carroll,<br>Chapter 7 Trustee: | Fox Rothschild LLP<br>By:  YANN GERON, ESQ.<br>100 Park Avenue, 15th Floor<br>New York, NY  10017 |
| | Fox Rothschild LLP<br>By:  WILLIAM H. STASSEN, ESQ.<br>     DANA SICHEL<br>     (telephonic appearances)<br>2000 Market Street, 10th Floor<br>Philadelphia, PA 19103-3291 |
| For Greenlight Entities: | Skadden, Arps, Slate, Meagher<br>  & Flom, LLP<br>By:  GREGG M. GALARDI, ESQ.<br>     JASON LIBERI, ESQ.<br>     (telephonic appearances)<br>One Rodney Square<br>Wilmington, DE  19899 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES: (Contd')

For Rural Telephone
Finance Cooperative:        Fulbright & Jaworski, LLP
                            By:   JOHN D. CORNWELL, ESQ.
                                  WILLIAM R. GREENDYKE, ESQ.
                                  (telephonic appearances)
                            300 Convent Street, Suite 2200
                            San Antonio, TX  78205

                            Wiltshire & Grannis, LLP
                            By:  KENT D. BRESSIE, ESQ.
                            1200 Eighteenth Street, NW, Suite 1200
                            Washington, DC  20036

                            Fulbright & Jaworski, LLP
                            By:  MARK A. PLATT, ESQ.
                            1301 McKinney, Suite 1500
                            Houston, TX  77010-3095

                            Fulbright & Jaworski, LLP
                            By:  GREGORY M. WILKES, ESQ.
                                  TOBY L. GERBER, ESQ.
                                  (telephonic appearance)
                            2200 Ross Avenue, Suite 2800
                            Dallas, Texas 75201-2784

                            Hunter, Cole & Bennett
                            By:  RICHARD H. HUNTER, ESQ.
                                  (telephonic appearance)
                            Christiansted, St. Croix
                            U.S. Virgin Islands

                            Moore, Dodson & Russell, PC
                            By:  J. DARYL DODSON, ESQ.
                                  (telephonic appearance)
                            5035 (14A) Norre Gade, Suite 1
                            P.O. Box 310
                            Charlotte Amalie, St. Thomas
                                        00804-0310

                            FRANK E. VAUGHAN
                            (telephonic appearance)

                            Fulbright & Jaworski, LLP
                            By:  RYAN HARTMAN, ESQ.
                                  (telephonic appearance)
                            801 Pennsylvania Avenue, N.W.
                            Washington, DC  20004-2623

**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES:  (Contd')

For Rural Utilities          Department of Justice
Services:                    Civil Division
                             By:  SHARON C. WILLIAMS, ESQ.
                                  (telephonic appearance)
                             Washington, DC

For Greenlight Entities:     Skadden, Arps, Slate, Meagher
                               & Flom, LLP
                             By:  THOMAS J. ALLINGHAM, ESQ.
                                  CHRISTINE KIM, ESQ.
                                  (telephonic appearances)
                             One Rodney Square
                             Wilmington, DE  19899

For Greenlight Entities:     Greenlight Capital
                             By:  ANDY WEINFELD
                                  (telephonic appearance)

For Prosser Children:        Goldman Law Offices, Inc.
                             By:  LEIGH F. GOLDMAN, ESQ.
                                  (telephonic appearance)
                             3562 Honduras, Suite 9
                             St. Thomas, VI 00802

For Ms. Prosser:             Law Office of Jeffrey B.C. Moorehead
                             By:  JEFFREY B.C. MOOREHEAD, ESQ.
                                  (video appearance)
                             Christiansted, St. Croix, VI

Pro se Appellant:            CARDINAL P. CONNOR
                             (telephonic appearance)

For John Klingerman:         Law Offices of Adam Hoover
                             By:  ADAM HOOVER, ESQ.
                             4000 La Grande Princess
                             P.O. Box 24342. Suite 1
                             St. Croix, VI  00824

For Ronald Sander:           Stearns Weaver Miller Weissler
                             By:  DREW M. DILLWORTH, ESQ.
                                  (telephonic appearance)
                             Museum Tower
                             150 West Flagler Street, Suite 2200
                             Miami, FL 33130

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES:  (Contd')

For Examiner, Steven          Stutzman Bromberg Esserman
A. Felsenthal:                 & Plifka, PC
                              By:  CLIFF A. TAYLOR, ESQ.
                                   (telephonic appearance)
                              2323 Bryan Street, Suite 2200
                              Dallas, TX 75201

For Stan Springel:            Hunton & Williams
                              By:  ANDREW KAMENSKY, ESQ.
                                   (telephonic appearance)
                              1111 Brickell Ave # 2500
                              Miami, FL

For Hotel Plaza               Reitler Brown & Rosenblatt, LLC
Athenee:                      By:  CRAIG J. ALBERT, ESQ.
                                   (telephonic appearance)
                              800 Third Avenue, 21st Floor
                              New York, NY  10022-7604

For U.S. Trustee              Office of the U.S. Trustee
Dept. of Justice:             By:  GUY G. GEBHARDT, ESQ.
                                   (telephonic appearance)
                              75 Spring Street, SW
                              Room 362
                              Atlanta, GA 30303

For FirstBank:                Dudley Topper & Feuerzeig
                              By:  JUSTIN HOLCOMBE, ESQ.
                              Law House
                              1000 Frederiksberg Gade
                              Charlotte Amalie
                              St. Thomas, U.S. Virgin Islands 00802


                         -  -  -

6

```
 1              THE COURT:  Good morning.

 2              ALL:  Good morning, Your Honor.

 3              THE COURT:  These are the matters of Innovative

 4  Communication Corporation, 07-30012, and Jeffrey Prosser, 06-

 5  30009.  Excuse me one second here, please.

 6                              (Pause)

 7              THE COURT:  I have a list of participants by phone.

 8  Thomas Allingham, Kent Bressie, John Cornwell, Robert Craig,

 9  Michaela Crocker, Drew Dillworth, Daryl Dodson, Gregg Galardi,

10  Toby Gerber, Leigh Goldman, William Greendyke, Ryan Hartman,

11  Richard Hunter, Christine Kim, Jason Liberi, Mark Platt, Stan

12  Springel, Dan Stewart, Cliff Taylor, Frank Vaughan, Andy

13  Weinfeld, Greg Wilkes, Sharon Williams, Andrew Kamensky, Craig

14  Albert, Guy Gebhardt, Justin Holcombe, Dana Sichel, and William

15  Stassen.  Can I get entries in the Virgin Islands, please?

16              MR. HOOVER:  Adam Hoover on behalf of John

17  Klingerman, St. Croix.

18              THE COURT:  Anyone else?  I don't think your

19  microphone's on.  Mr. Moorehead, I don't think your

20  microphone's turned on.

21              MR. MOOREHEAD:  Can you hear me now, Judge?

22              THE COURT:  Yes, thank you.

23              MR. MOOREHEAD:  It's Jeffrey Moorehead at the

24  courthouse in St. Thomas.  Good morning, everyone.

25              THE COURT:  And you're here for Dawn Prosser.
```

**J&J COURT TRANSCRIBERS, INC.**

1  Correct?

2           MR. MOOREHEAD:  Yes, Your Honor.

3           THE COURT:  All right.  Thank you.  Is there anyone

4  else in the Virgin Islands with you, Mr. Moorehead?  I can't

5  see anyone there.

6           MR. MOOREHEAD:  No, Your Honor.  I'm the only one

7  here.

8           MR.. CONNOR:  Yes --

9           THE COURT:  Mr. Moorehead, I'm sorry?

10          MR. MOOREHEAD:  I'm in the visiting judges'

11 courtroom.  I'm the only one here.  If you want me to

12 reposition the video I can, but I'm the only one in the room,

13 Your Honor.

14          THE COURT:  No, that's fine.  I just couldn't see

15 anybody but you.  I just wanted to make sure there wasn't

16 anybody off camera.  Thank you.  Okay.

17          MR. MOOREHEAD:  Yes.

18          THE COURT:  Okay.  Mr. Connor.

19          MR. CONNOR:  Yes, Cardinal P. Connor, retired

20 employee.

21          THE COURT:  All right.  Is there anyone else in St.

22 Croix?

23          MR. HOOVER:  There is not, Your Honor.

24          THE COURT:  All right.  Thank you.  I'll entries here

25 in Pittsburgh, please.


**J&J COURT TRANSCRIBERS, INC.**

8

1          MR. LEE:  Good morning, Your Honor.  Jim Lee of

2  Vinson & Elkins on behalf of Stan Springel, the Chapter 11

3  Trustee.

4          MR. WILKES:  Good morning, Your Honor.  Greg Wilkes

5  on behalf of the RTFC and also with me in the courtroom is Kent

6  Bressie of the Harris Wilshire firm.

7          THE COURT:  Thank you.

8          MR. GERON:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10         MR. GERON:  Yann Geron from Fox Rothschild on behalf

11  of Jim Carroll, the Chapter 7 Trustee, and as Your Honor noted,

12  William Stassen is also on the line.  He may be -- he will be

13  handling a couple of the matters this morning.

14         THE COURT:  All right.  Thank you.  Good morning.

15         MR. ABOOD:  Good morning, Your Honor.  Norman Abood

16  on behalf of Mr. Prosser, and, hopefully, Mr. Craig is on line

17  with us.

18         THE COURT:  All right.

19         MR. ABOOD:  He could not be here because of an

20  illness.

21         THE COURT:  All right.  Thank you.

22         MR. ABOOD:  Thank you.

23         THE COURT:  Mr. Lee.

24         MR. LEE:  Yes, Your Honor, good morning.  Your Honor,

25  Dan Stewart is on by telephone, and as traditional, we would

**J&J COURT TRANSCRIBERS, INC.**

1  open with our status report, briefly, and Mr. Stewart will

2  handle that.

3             THE COURT:  All right.  Mr. Stewart.

4             MR. STEWART:  Thank you, Your Honor.  As is our

5  custom, we did file on Friday afternoon or early evening our

6  written status report for this morning's omnibus hearing.  I

7  will not read the ten-page report that's on file, but I will

8  briefly highlight some of the matters that we mentioned in

9  there.  The -- I think of significance relative to current

10 operations is the fact that as the process, the regulatory

11 process continues relative to approval of the transfer and sale

12 to the designee and assignee of the RTFC under Your Honor's

13 interim sale approval order, most of the activity of the

14 Trustee is and has been relative to making certain that the

15 sale does go through in a timely fashion, and that the business

16 continues to operate properly in anticipation of that.

17             Significantly, the -- there is in process currently a

18 loan to be made to several of the affiliated but non-debtor

19 entities of close to $29 million from the RTFC in anticipation

20 of that closing but not conditioned on it, which will be

21 utilized for necessary capital expenditures for which this

22 family of companies has been starved for a number of years, and

23 we're pleased to report that we anticipate in the next week to

24 ten days a closing of that significant loan to certain of the

25 non-debtor entities that will enable those capital expenditures

1  to commence.

2        In addition, the Trustee and his professionals are

3  preparing for the upcoming collective bargaining agreement

4  negotiations with the steel workers union which represents

5  Vitelco's and the Cable TV's hourly workers.  This is the usual

6  and anticipated every other year collective bargaining

7  negotiation, and that should be concluded we anticipate by mid-

8  September.

9        Relative to the Group I asset sales, as I indicated a

10  second ago, all focus by the Trustee and his professionals has

11  been on obtaining now and prosecuting the required regulatory

12  approvals.  The Virgin Island Public Services Commission has

13  appointed a hearing examiner relative to the change of control

14  proceeding that has been discussed in this court and in our

15  previous status report for several months now.

16        The time frame for the hearing examiner report and

17  investigation and then the ultimate PSC approval is dovetailing

18  generally with this Court's sale hearing schedule.  We had been

19  anticipating and frankly hoping that the final review and

20  approvals by the PSC would occur in time for consideration by

21  this Court at the November 30 omnibus this upcoming fall.

22  Currently, the initial hearing examiner schedule that has been

23  adopted anticipates a final PSC hearing in December of 2009.

24  So as a result, we are currently discussing with the PSC

25  several options for expediting that preliminary schedule, so

1  that the regular regulatory time line would be more closely

2  aligned with our plan fail closing time line as we previously

3  advised, Your Honor.  It is still the Trustee's anticipation

4  that calendar year 2009 will be the ultimate closing date.  The

5  other regulatory approvals are pending and well under way, each

6  at the Federal Communications Commission with the BVI and with

7  the Netherlands Antilles government.

8         At our last omnibus hearing of July 22 at the

9  conclusion Mr. Abood asked me two questions that I told Mr.

10  Abood I'd be delighted to visit with him further about and/or

11  report on in our next report, which I have done.  First is

12  relative to the Belize Telecom litigation, which, as we have

13  reported for several months and as the parties are aware, the

14  Belize Telecom litigation that had been pending at the time of

15  the Trustee's appointment continued to a conclusion, and it is

16  -- that conclusion is that Vitelco is highly unlikely to

17  receive any payments on what we described earlier as the Belize

18  note.

19         However -- and this was the question that was raised

20  on July 22 -- 100 percent of that Belize note amount had been

21  reserved for going back to the 2006 financial statement.  So

22  while it is anticipated that the Belize note will be fully

23  written off for tax purposes, this write off that has been in

24  the making for many years will not directly affect Vitelco's

25  rate of return, since that was not part of Vitelco's regulated

12

1  assets that are utilized for purposes of calculating its rate

2  of return at the Public Services Commission.

3          In addition, Mr. Abood asked me if the Trustee was

4  aware of the Fitch ratings.  That is a regulatory -- or not a

5  regulatory but a private rating agency having put the National

6  Rural Utilities Co-op Finance Corp. on a rating watch negative.

7  We are aware of that.  The Trustee does not believe that that

8  will affect the scheduled closing of the Group I assets.

9  Indeed, nor has it affected the ability of the Trustee to

10 obtain and we look forward to closing the $28 million capital

11 improvement loan I referenced a moment ago.

12         We previously reported to the Court that the RTFC, in

13 furtherance of its preparations for ultimate closing here, had

14 acquired the Vitelco preferred shareholders' stock in a global

15 settlement.  The Trustee in his capacity for ICC, LLC is the

16 owner of a nominal 250 shares of that preferred stock of

17 Vitelco, which represents slightly more than three-tenths of

18 one percent of those shares.  And we have filed the Trustee's

19 application for an order approving that sale, which is

20 scheduled for hearing on October the 8th.  That will generate

21 approximately several hundred thousand dollars for the ICC, LLC

22 estate.

23         The Trustee continues to work closely with the

24 Pension Benefit Guaranty Corporation.  We've outlined the

25 various contributions made by the Trustee for the benefit of

**J&J COURT TRANSCRIBERS, INC.**

1  both retirement plans, and the Trustee anticipates making

2  another payment to those plans on or before October the 15th.

3        The balance of our report, Your Honor, discusses the

4  status of the various litigation matters before this Court, the

5  District Court, and the Third Circuit.  I don't think I need to

6  review those in detail orally.  The status of those is

7  contained in the last four pages of our report.  And, again, in

8  conclusion and in summary, the focus of the Trustee in addition

9  to the various litigation matters pending is naturally the

10  approval by the regulatory authority of the change of control

11  and preparing for and getting ready for the closing of those

12  transactions late this fall in 2009.  Thank you, Your --

13        THE COURT:  Anyone have --

14        MR. STEWART:  Thank you, Your Honor.

15        THE COURT:  Thank you.  Anyone have any questions of

16  Mr. Stewart?

17        MR. ABOOD:  Yes, Your Honor.

18        THE COURT:  Mr. Abood.

19        MR. ABOOD:  May I do that from here or should I --

20        THE COURT:  Yes.

21        MR. ABOOD:  Thank you.  Norman Abood on behalf of Mr.

22  Prosser.  Thank you, Mr. Stewart, for the updates.

23  Specifically with regard to the Rural Telephone Finance

24  Cooperative loan, is that loan actually being made by C -- what

25  we call CFC or is it coming from RTFC?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. STEWART:  I think neither, Mr. Abood.  I will be

2     delighted to get you the -- I don't have those draft loan

3     papers in front of me, but it is anticipated that the -- that

4     the loan will be made by an affiliate of the Rural Telephone

5     Finance Cooperative, the RTFC that is.

6          MR. ABOOD:  Can you tell us how much of the loan is

7     anticipated to be made to Vitelco?

8          MR. STEWART:  Zero.  Zero dollars.

9          MR. ABOOD:  Okay.  The credit rating situation I --

10    are you aware of whether or not Standard & Poor's has also

11    recently downgraded CFC?

12         MR. STEWART:  I don't know if that's a fact or not.

13    If it is, I'm unaware of it.  But I would suggest again, as I

14    did last time, I'd be delighted to have this discussion with

15    you whenever is a convenient time rather than as we deliver

16    these reports.  If -- I'd like to answer your questions in

17    anticipation of filing our Trustee's reports, but again, I

18    don't have all of that material at my beck and call this

19    morning.  So the answer is long-winded, no, with a suggestion

20    feel free to call me in advance, and I'll ferret that

21    information out for you in advance going forward.

22         MR. ABOOD:  With regard to the Belize litigation,

23    taken a quick look at the -- what I could of the proceedings,

24    and it appears that counsel for the debtor entities simply did

25    not respond -- did not file anything in response to the

**J&J COURT TRANSCRIBERS, INC.**

1 opposition's motion for summary judgment.  Are you aware of

2 that, and if so, why did we go through all this effort and not

3 even respond to a motion for summary judgment?

4       MR. STEWART:  Well, I don't think that's accurate,

5 Mr. Abood, and indeed we employed as special counsel for the

6 Trustee the firm that had been engaged by Mr. Prosser who had

7 been -- which firm had been pursuing that litigation on behalf

8 of the ICC, LLC estate for the several years that -- prior to

9 Mr. Springel's appointment as Trustee.  And, no, I don't think

10 that's the case, and, in any event, it was a continuum of the

11 representation by the Trustee of the same firm that had been

12 handling the matter on behalf of the Mr. Prosser-run LLC estate

13 before his appointment as approved by the Court.

14       So, no, we've not gone back to flyspeck or second

15 guess or try to recreate the wheel relative to how that counsel

16 pursued the litigation.  We just let him run with it as it

17 related to a continuum of representation.

18       MR. LEE:  Your Honor, this is Jim Lee.  If I might

19 make a suggestion here.  To get hit cold with these questions,

20 as the Court I think knows, there were four different

21 proceedings in Belize not counting an arbitration that was

22 going on in Canada.  If Mr. Abood, rather than waiting until

23 the hearing and then asking us these questions where we have to

24 spontaneously try to respond where sometimes they require

25 research, could either call us, as Mr. Stewart has invited him

**J&J COURT TRANSCRIBERS, INC.**

1 to do in the past, or submit written questions to us, we will

2 be glad to provide them to him and include them in our status

3 report.  But it's a little unfair to be asked these kind of

4 complicated questions without any opportunity to research and

5 respond.

6         THE COURT:  That's fair enough.  Mr. Abood, contact

7 the Trustee in advance, because it seems that if the questions

8 are there, they're not really generated by the status report.

9 These questions concerning the Belize litigation have been out

10 there for a while, and to the extent that you want some

11 additional information, I had -- I think it should be in the

12 status report to the extent it's relevant to these estates.

13 But, nonetheless, it would be advisable to get the questions to

14 the Trustee in advance, and then if he can't answer them, then

15 it's something that probably should be raised on the record.

16 But, surely, they should have some time in advance.  So

17 continue for today, but starting for the next one, contact the

18 Trustee in sufficient time that he can research the issues and

19 include the information in the status reports, please.  All

20 right.  Go ahead.

21         MR. ABOOD:  Thank you, Your Honor.  I didn't think

22 that question was that complicated, but I understand and will

23 abide by the Court's request.

24         THE COURT:  Well, it's complicated to the extent that

25 the Trustee isn't -- this counsel isn't counsel in the Belize

 1  litigation.  And, in fact, in appointing the special counsel

 2  Mr. Prosser's counsel I -- as I recall, was very happy about

 3  the fact that the Trustee was ongoing with the former counsel.

 4  So there has to be some relationship there on both parts that

 5  could perhaps be discussed in advance, so that the information

 6  can be included in the report.  In any event, go ahead.

 7          MR. ABOOD:  I would point out to the Court, Your

 8  Honor, that -- just so the Court is aware, that there was

 9  simply, absolutely no contact with the officers in charge of

10  the Belize transaction in the pursuit of the litigation.

11  Neither -- and it was offered, but --

12          THE COURT:  I'm -- I don't know any --

13          MR. ABOOD:  -- I'll put that aside.

14          THE COURT:  -- of this, Mr. Abood.

15          MR. ABOOD:  Understand.

16          THE COURT:  And, frankly, at this point it's not

17  relevant.  I think what the issue is, is you've got some

18  questions.  Let's get the information into the report.  Go

19  ahead.

20          MR. ABOOD:  I'm not sure if I understand and I don't

21  understand the answer with regard to the effect of the loss of

22  the Belize litigation on the ability to upstream funds.  I

23  understand -- I mean I heard the answer, but I didn't ask about

24  the effect of the litigation on the rate of return or rate

25  base.  The question was directed to the restriction emanating

**J&J COURT TRANSCRIBERS, INC.**

1 from the PSC order that there be a 40 percent debt equity ratio

2 maintained in order for any funds to be upstreamed, and the

3 effect of this litigation, if any, on that debt equity ratio --

4 　　　　MR. STEWART:  I don't recall that being your question

5 at all, Mr. Abood back on July the 22nd.  I'll go and be --

6 　　　　MR. ABOOD:  Well, Mr. --

7 　　　　MR. STEWART:  -- be delighted to check that

8 transcript again, but this is exactly what I was suggesting

9 earlier.  If you've got regulatory or detailed questions

10 respecting treatment accountingwise, regulatorywise, or

11 otherwise, why don't you just give me a call, and I'll do my

12 best to get the questions responded to?

13 　　　　MR. ABOOD:  Your Honor, if I would reference -- I

14 reference you to footnote Number 3 on Page 4 of the status

15 report.  Mr. Stewart, I don't know what you're saying, because

16 in there you specifically reference the question and state that

17 you were asked, "The recent ruling in the Belize Telecom

18 litigation will -- what effect it will have on the New ICC's

19 ability to upstream funds from Vitelco."  That is your status

20 report.

21 　　　　THE COURT:  Okay, Mr. Stewart, would you please get

22 the answer to that and include it in the next status report,

23 because that is of concern to this Court as well, and that's

24 one thing that I did ask to be included?  Because to the extent

25 that the payments were administrative expenses are being

**J&J COURT TRANSCRIBERS, INC.**

1   upstreamed, that is a very relevant consideration, and the

2   Trustee has an obligation to tell this Court what the result of

3   that is.  So, please, get that answer included in this report.

4   Go on, Mr. Abood.

5           MR. ABOOD:  Thank you, Your Honor.  With regard to

6   the Vitelco preferred shareholders, Your Honor, I point out

7   that from my review of the pleadings, I've never seen the

8   actual terms and conditions, so it's -- we're not able to

9   discern what the financial effect, if any, there is on Vitelco

10  from this settlement

11          THE COURT:  I'm not following.  I'm sorry.

12          MR. ABOOD:  The settlement of the preferred

13  shareholder litigation.

14          THE COURT:  Oh, Mr. Stewart said that he's going to

15  file a motion or has -- I haven't seen it yet -- to sell the

16  estate's interest in the stock, and that will be coming up for

17  hearing on October 8.  So at that point in that motion there

18  should be some financial information concerning that issue.

19          MR. ABOOD:  If we could just make clear, because I'm

20  talking about something different than  --

21          THE COURT:  Oh.

22          MR. ABOOD:  -- New ICC sale of its limited number of

23  shares.  There's the underlying settlement agreement with

24  regard to the vast majority of the shares, and we've never been

25  able to -- other than being told that there was a dollar

1  amount, we don't know what other -- or even if there are any

2  other terms and conditions to that transaction --

3          MR. LEE:  Your Honor, that's between two non-debtor

4  entities, and I don't know why Mr. Abood has any right to it.

5  The RTFC settled with the shareholders concerning Vitelco,

6  three non-debtor entities.  I mean that is not something he's

7  entitled to get, unless he's got some claims or rights, in

8  that, in which case the Trustee is not involved.  This -- I

9  mean we're hijacking these omnibus hearings to answer

10 questions.  He's conducting discovery --

11         THE COURT:  Well, I --

12         MR. LEE:  -- is all he's trying to do.

13         THE COURT:  To the extent that Vitelco is not a

14 debtor and the preferred shareholders are not before this Court

15 at this time, I don't think there's even been a motion filed

16 regarding that issue.  So, to the extent that the estate has an

17 interest in that it owns preferred shares, it will be filing or

18 has -- I'm not sure -- has filed a motion to sell that's set

19 for hearing October 8, and in connection with that sale will

20 want the same information we always want with respect to why

21 it's in the best interest of the estate to do it.  So, to the

22 extent that the estate has an interest, it'll come up in that

23 fashion.  To the extent that it's between non-debtor entities,

24 it's non-debtor entities.

25         MR. ABOOD:  Your Honor, if I may just point out the

1  relevance from Mr. Prosser's standpoint, is that Vitelco is

2  obviously the single most valuable asset in the group of assets

3  that can be used to liquidate the outstanding claims of the

4  estate, some of which obviously impact Mr. Prosser personally.

5  And --

6           THE COURT:  But see, that's -- you keep saying that,

7  Mr. Abood, and I keep disagreeing.  The settlement agreement

8  imposes on Mr. Prosser a $100 million liability that is joint

9  and several.  Mr. Prosser is on the hook for $100 million

10 regardless of what else happens in these estates, unless these

11 estates are totally solvent and can return every other dollar

12 but that $100 million back.

13         What's happening in these estates has absolutely no

14 consequence on that $100 million liability of Mr. Prosser,

15 because, as everybody recognizes, these estates are insolvent.

16 They have never come up with sufficient funds to even pay the

17 RTFC debt let alone whatever other debts are out there,

18 including the PBGC debt.  So I'm still at a loss.  Unless you

19 can give me some indication of how these estates will be able

20 to generate sufficient dollars to pay all the liabilities up to

21 that $100 million Mr. Prosser owes on his own, I'm missing

22 something.

23         MR. ABOOD:  Your Honor, obviously, the amount that

24 the assets sell for in total may have an effect on the amount

25 that Mr. Prosser ultimately owes.  If, for example --

**J&J COURT TRANSCRIBERS, INC.**

22

1              THE COURT:  I don't think so.

2              MR. ABOOD:  Just a numerical example, and I may be --

3              THE COURT:  All right.

4              MR. ABOOD:  -- you're going to educate me.  If

5    there's a total indebtedness of -- pick a number -- 500

6    million, and Mr. Prosser's obligated for 100 of that, and the

7    assets sold for 450, obviously, he only owes a balance of 50.

8              THE COURT:  That's right.  But, as I understand it,

9    the debt at this point is over $600 million, because that's

10   what was -- 620 I think.  I'm sorry.  I'm not sure about the

11   exact details -- was what they were trying to settle way back

12   when for 402, and nothing to date has even generated up to the

13   402 let alone the 620.  So unless and until these estates can

14   be shown to be solvent, and if Vitelco is the major asset that

15   should generate the most income and the sale that -- the only

16   one so far -- the only offer that has come forward that seems

17   to be going forward, and we're not to a sale hearing, so I

18   don't know this yet for sure.  But the only one that I've heard

19   any information about doesn't even get up to the 402.

20             So the extent that these estates are not solvent, and

21   that's what I have to conclude at the moment, because I haven't

22   had any evidence anywhere ever in these cases that these

23   estates are solvent, nothing that's happening in these cases is

24   going to effect Mr. Prosser's $100 million liability.  And

25   that's where I am having difficulty understanding why Mr.

**J&J COURT TRANSCRIBERS, INC.**

1 Prosser is asking these questions about the Vitelco preferred

2 shareholders.  He can go ask Vitelco to the extent that he's

3 got some interest there, but I don't see what it has to do with

4 this estate.

5          MR. ABOOD:  May I respond?

6          THE COURT:  And so -- yes.

7          MR. ABOOD:  Your Honor, that's part of -- that's a

8 major difficulty that is faced by Mr. Prosser and his counsel,

9 is that the major -- the single most valuable asset -- indeed

10 all the income -- really truly income producing assets of this

11 estate have been and continue to be managed outside the scope

12 of these proceedings and --

13          THE COURT:  As they were when Mr. Prosser was in

14 charge.

15          MR. ABOOD:  And as a consequence, the -- there is no

16 scrutiny, there's no ability to ascertain the manner in which

17 they are being maintained, the manner in which they are being

18 run, whether or not they are being unnecessarily drained of

19 assets.  That has come up in prior proceedings with regard to

20 allocation of fees.  This Court has asked for some clarity,

21 some sunlight, on what's happening with that allocation of

22 fees.

23          So to the extent that these assets are being drained

24 or not properly run, that has a direct effect obviously on

25 their market value, which obviously then could have an effect

**J&J COURT TRANSCRIBERS, INC.**

24

1  on how much remaining debt there is after their sale.  It's the

2  way that this case has been structured and has gone forward.

3  There simply is no scrutiny of what's happening with the main

4  assets --

5              THE COURT:  They're not before me.

6              MR. ABOOD:  -- involved.

7              THE COURT:  The problem is --

8              MR. ABOOD:  I understand that.

9              THE COURT:  That problem is --

10             MR. ABOOD:  That's the problem.

11             THE COURT:  -- I have no jurisdiction to scrutinize

12 those entities.

13             MR. ABOOD:  And that's --

14             MR. LEE:  Your Honor, this is --

15             MR. ABOOD:  In prior hearings, and I'm sure the Court

16 will recall, we've asked the Court -- and you yourself said --

17 made comments about whether or not -- I think as long as last

18 -- end of last year, that perhaps it would be advisable to

19 bring the operating entity within the scope of these

20 proceedings.

21             THE COURT:  No, I have never opined that it is or

22 isn't advisable to bring in anybody else's assets.  I have

23 asked why, if everything is being upstreamed, all of the

24 entities aren't before the Court, because it may make sense in

25 a sale context to use the bankruptcy processes for that

1  purpose.  The Trustee's in charge of that not me.

2           MR. LEE:  Your Honor, if I could be heard, this is

3  highly inappropriate.  Mr. Abood's client has not filed any

4  sort of a motion to which we've had any opportunity to respond

5  that allows for the consideration of all these arguments he

6  seems to be making.  We strenuously object to these unsupported

7  allegations he's making about how the company was run or not

8  run.  He knows it's a regulated entity.  The allegations

9  concerning the allocation of fees all had to do with the time

10  when Mr. Prosser was in control of the entities.  So this is

11  just not proper.  This is an omnibus hearing.  The Court

12  requires an agenda.  We filed the agenda, and Mr. Abood hijacks

13  it each time trying to push forward an agenda that's not

14  scheduled.

15           THE COURT:  Mr. Lee, I have asked Mr. Abood and

16  anyone else if they have questions of Mr. Stewart related to

17  the status report.  This question I think is not related to the

18  status report, because, you're quite correct, to the extent

19  that the estate has ownership of preferred shares, the issue

20  will come up in the context of the estate's request to sell

21  those shares.  Other than that, I don't have jurisdiction over

22  Vitelco.  I only have jurisdiction over the debtor entities.

23  So, Mr. Abood, you're going to have to ask this question of

24  Vitelco.  What else do you have for Mr. Stewart?

25           MR. ABOOD:  On Page 1 of the status report, Mr.

**J&J COURT TRANSCRIBERS, INC.**

1   Stewart reports in there under Subsection (a) the second full

2   sentence, "Liquidity and cash reserves also remain stable."

3   Are funds continuing to be upstreamed from the subsidiaries is

4   the question.

5              THE COURT:  Mr. Stewart.

6              MR. STEWART:  Yes, Your Honor.  Only in accordance

7   with the agreement between the and in conformity with the

8   agreement between the -- Vitelco and the Rural Utility

9   Services, but there have been no upstreaming of funds to pay

10  any administrative expenses for over 15 months since the RUS

11  asked us not to.

12             THE COURT:  All right.

13             MR. ABOOD:  What is the current status of the estate?

14  Does it have sufficient funds to operate on its own?

15             MR. STEWART:  Yes, it does.

16             MR. ABOOD:  With regard to the -- I suppose we could

17  talk about the insurance when that motion comes up.

18             THE COURT:  Yes, we will be talking about the

19  insurance with respect to that motion.

20             MR. ABOOD:  Thank you.

21             THE COURT:  Anyone else?

22                         (No verbal response)

23             THE COURT:  All right, Mr. Stewart, thank you.  While

24  we're on that subject, I know it's last on the agenda, but it's

25  also an emergency motion.  That's Number 31.  Frankly, I think

1  we should turn to that first --

2           MR. LEE:  Okay.

3           THE COURT:  -- because it is sort of relevant to this

4  report, and it makes sense to do it now.

5           MR. LEE:  Fine, Your Honor.  Whatever way you'd like

6  to proceed, we're ready.

7           THE COURT:  All right.  Let's turn to that one,

8  please.  Let me start with my question.

9           MR. LEE:  Sure.

10          THE COURT:  This motion says that the debtor -- that

11 the estates are not party to the agreement.  So, number one,

12 I'm not sure why I have a motion.  Number two, I don't

13 understand the order, which purports to grant liens against

14 this estate and also indicates that the estate defaults in a

15 payment obligation, then the FIFC may terminate the insurance.

16 But if the estate's not a party to this, (a) why are there

17 liens granted against the estate, and (b) the estate doesn't

18 have a payment obligation, so why is their order -- language in

19 the order that indicates that if there's a default, the FIFC

20 can then collect on those liens that I'm not sure why they're

21 being driven in the first place?  None of this makes any sense

22 to me.

23          MR. LEE:  Your Honor, I will do my best to explain,

24 and to the extent I can't do it sufficiently, I'll ask those on

25 the phone to jump in.  But the way it works is this.  The bulk

**J&J COURT TRANSCRIBERS, INC.**

1 of the assets that are being insured are actually Vitelco

2 assets, and through historic practice, the premium, which is

3 substantial -- it's several 100,000 dollars on an annual basis.

4 This is general liability insurance.  The premium if financed

5 to assist with the cash flow of the company, so it doesn't all

6 have to be paid in a lump sum.  Under that umbrella, if I can

7 use the term, of insurance each of the other entities within

8 the New ICC families has a small portion of coverage.

9      In the case of New ICC the total amount of the

10 premium allocated to it for that coverage is about $12,633.

11 The insurance company, in order to do the financing of the

12 premium payment, wants to have liens against the policies and

13 the premiums.  So, for example, if there's coverage that would

14 be activated, but there is a default in paying a future portion

15 of the premium, the insurance company can in essence do an

16 offset of what it is owed for the premium against coverage it

17 might otherwise have to award.  And so the liens that are in

18 question here really are tied to the insurance itself to the

19 premium coverage, to any amounts that may be owed back, because

20 a lot of these are adjusted.

21      THE COURT:  But Vitelco has the assets.

22      MR. LEE:  Well, Vitelco has most of the assets.  This

23 is only allocated to a portion, and it's only allocated to --

24      THE COURT:  But New ICC's obligation, according to

25 the motion, is to reimburse Vitelco not to pay directly to

1 FIFC.

2          MR. LEE:  Right, but the insurance carrier, because

3 we are in bankruptcy, has been adamant that they don't want to

4 let this policy go forward unless they have a Court order.

5          THE COURT:  Well, that's okay.

6          MR. LEE:  And it --

7          THE COURT:  I'm fine with a Court order.  I'm just

8 not fine about the fact that if there's a default on New ICC's

9 obligation to Vitelco, that somehow or other that gives FIFC a

10 right to collect on liens against this estate when the estate's

11 not a party to this at all.

12          MR. LEE:  I may misunderstand, and it may be the way

13 the order's drafted, Your Honor, but I don't think that's the

14 way it works.  Now, if Vitelco were to default in the overall

15 premium --

16          THE COURT:  Right.

17          MR. LEE:  -- then there would be an issue.

18          THE COURT:  I agree.  There should be an issue under

19 those --

20          MR. LEE:  Right.

21          THE COURT:  -- circumstances.

22          MR. LEE:  But I don't think --

23          THE COURT:  -- but that's not what this order says.

24          MR. LEE:  -- if -- I don't think if New ICC fails to

25 pay Vitelco, but Vitelco otherwise, for example, covers, that

1   the insurance company can take action against New ICC.  Now, I

2   will admit to the Court I have not read the order, so if

3   there's some semantic problem and if Ms. Crocker's on the

4   phone, maybe she can chime in here.  But --

5               MS. CROCKER:  I'm --

6               MR. LEE:  Are you there, Michaela?

7               MS. CROCKER:  Oh, yes, I am.  Your Honor, I -- what

8   may solve this issue is in that third ordered paragraph on Page

9   2, if Your Honor would prefer us to change it to, "Ordered,

10  that in the event that there is a default under the terms of

11  the premium financing agreement," and then there's no reference

12  to New ICC as the debtor.  It would just be that payment to

13  default at the Vitelco level.

14              THE COURT:  That doesn't cure this order, I don't

15  think.  Maybe it does, because it says, "In the event that the

16  debtor defaults under the terms of the premium finance

17  agreement," but the debtor's not party to it.

18              MS. CROCKER:  Correct.  So that would be -- if we

19  would remove reference to the debtor's default just to a term

20  of a general default.

21              THE COURT:  And then it -- the next paragraph

22  provides a lien against the assets of the debtor, and the

23  debtor's not party.

24              MS. CROCKER:  Well, it would be a lien against the --

25              MR. LEE:  The policy.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. CROCKER:  -- the policy.

2          MR. LEE:  It's against the policy only as I

3    understand it, Your Honor, and to the extent we have an

4    interest in it.

5          THE COURT:  It -- okay.  The second paragraph says

6    that, "The estate is authorized to grant FIFC a first priority

7    security interest, i.e., lien, in the policy including, but

8    only to the extent permitted by applicable law, all money that

9    is or may become due under the premium financing agreement

10   because of the loss under the policy that reduces unearned

11   premiums subject to the interest of any applicable mortgagee or

12   loss payee and any return of premiums or unearned premiums

13   under the policy and any dividends that may become due the

14   debtor's estate in connection with the policy."

15         MR. LEE:  Right.  So the way it works is, Your Honor,

16   let's say the policy is for $300,000, and they have a coverage

17   event at a point in time where the insureds have only paid

18   $100,000 over time, because they've stretched out the 300,000.

19   If a coverage event occurs, then they can deduct the 200,000

20   off the top for the remainder of their premium before --

21         THE COURT:  They can to Vitelco.

22         MR. LEE:  Right.

23         THE COURT:  Because Vitelco's the party.

24         MR. LEE:  Right.  And -- but it's to the extent we

25   have an interest, the insurance company wanted to be sure that

1  we -- that the bankruptcy proceeding wouldn't interfere with

2  their right to do that, and since they --

3          THE COURT:  It seems to me if the estate's interest

4  in this policy is for 12,600 and some odd dollars, it ought to

5  pay that, and then its interest in the policy is done and over

6  with, and the rest of it goes to Vitelco.  I don't understand

7  for $12,600 why we're going into these kinds of liens issues.

8          MR. LEE:  Point well taken.  So the Court is saying

9  we should make a lump sum payment to Vitelco, and then the lien

10 ought to stay at Vitelco only.

11         THE COURT:  Yes.

12         MR. LEE:  Your Honor, I just don't know.  We'll try

13 it --

14         MR. STEWART:  We can work with that, Your Honor.

15 Dan --

16         MR. LEE:  We'll try it with the company.

17         MR. STEWART:  This is Dan Stewart.  We can work with

18 that, Your Honor, and we'll go back to the broker and --

19         MR. LEE:  See what we could --

20         MR. STEWART:  -- so advise the broker.

21         THE COURT:  Okay, because the problem I have is that

22 if the debtor isn't a party to the agreement, I don't

23 understand why the onerous consequences are coming on the

24 debtor.

25         MR. LEE:  Well --

1        THE COURT:  To the extent that the debtor may be

2  entitled to some dividend or refund, I understand that, and I

3  don't have a problem with the debtor's portion of the premiums

4  being deducted from any dividend that may be due to the debtor

5  or loss payable that may be due to the debtor.  But it seems to

6  me if the debtor simply makes its proceeds, then it's entitled

7  to recoup, and it doesn't have to worry about some subject of

8  default.

9        MR. LEE:  I mean we clearly are a beneficiary under

10  the policy --

11        THE COURT:  Yes.

12        MR. LEE:  -- because we're an insured.

13        THE COURT:  Yes, I understand that you're a

14  beneficiary, but -- that the estate, that is, is a beneficiary,

15  but being a beneficiary is still a bit different.  In any

16  event, other than that, I don't have a problem with the premium

17  finance.  I understand the need to finance the premiums, and I

18  don't have a problem with the debtor paying its fair share of

19  whatever that is.  That's historically what's been done.  But I

20  do have a problem with the way the order is crafted but --

21        MR. LEE:  We'll see if we can't resolve that now that

22  we understand the Court's concerns, Your Honor.

23        THE COURT:  All right.  Any objection -- I'm not

24  aware that any objections were filed to this motion.

25        MR. LEE:  I don't believe so, Your Honor.

34

1          THE COURT:  Mr. Abood, you had a question?

2          MR. ABOOD:  You asked my questions, Your Honor.

3    Thank you.

4          THE COURT:  All right.  Can I get a revised order

5    from you then?

6          MR. LEE:  Yes, we will submit one, Your Honor and

7    obviously circulate it to --

8          THE COURT:  All right.  Thank you.  I'll wait to get

9    it.  I understand this should be happening pretty promptly.

10   Okay.  After that, Mr. Lee, I don't really have a preference as

11   to where you want to start.

12         MR. LEE:  Okay.  Well, then I'll just go in order it

13   if that's okay, Your Honor.

14         THE COURT:  Okay.  Give me one second to get there on

15   my proceeding memo, please.

16                         (Pause)

17         THE COURT:  Okay.  Item one, Mr. Lee.

18         MR. LEE:  Yes, Your Honor.  This is the Chapter 11

19   Trustee's objection to proof of claim that had been filed by

20   creditor David L. Sharp.  The status of this is, is that there

21   was an arbitration involving the matters that were the subject

22   of the proof of claim and the objection.  Settlement was

23   reached.  As part of that settlement, Mr. Sharp agreed to file

24   and has filed a motion to withdraw his claim.  We have

25   submitted an order that would grant that withdrawal.  It's

**J&J COURT TRANSCRIBERS, INC.**

1  Docket Entry 1330, but as of the last time I checked before

2  leaving, I don't believe the order had actually been signed

3  yet.  But that order would resolve the objection.

4        THE COURT:  I think -- I do have an order here that

5  just indicates that the -- his motion to withdraw the claim was

6  filed on August the 14th, and, therefore, it's to be marked as

7  withdrawn.  Is that the correct order?

8        MR. LEE:  That's correct.  All he's doing is

9  withdrawing the claim, which is a condition of the settlement.

10        THE COURT:  And are there any objections to this?

11        MR. LEE:  To the withdrawal?

12        THE COURT:  Yes.

13        MR. LEE:  We've received none, Your Honor.

14                    (Pause)

15        THE COURT:  All right.  I've entered that order.

16        MR. LEE:  Thank you, Your Honor.  Your Honor, that

17  brings us to Item Number 2 on the agenda, which is the second

18  quarterly and final application of Hunton & Williams, LLP for

19  their fee as general bankruptcy counsel to the Trustee.  The

20  response deadline was August the 14th.  There were no

21  objections or responses that were received.

22        THE COURT:  This order should've been entered.  If it

23  hasn't been, it's just because it hasn't been done in the

24  Virgin Islands yet.  But, Mr. Lee, I'm having a problem with

25  these, because the binder only had the application of Hunton &

1  Williams.

2       MR. LEE:  There was a new form of order, Your Honor.

3  I don't know if it's been uploaded.  I do have a hard copy with

4  me, and, apparently, that is what happened.

5       THE COURT:  I've reviewed them all, because I printed

6  them all, but all of them need to get into the binder.  Even if

7  there are no objections, I still have to review all the fees.

8  So I did --

9       MR. LEE:  Oh, okay.

10      THE COURT:  -- that last week, and I think there was

11  an omnibus order that I gave my staff to have entered, because

12  no objections had been filed to any, and I did review them.  I

13  didn't see a problem with any of the fee applications as

14  requested.  So that order I believe is sitting somewhere if it

15  hasn't been entered on the docket yet.

16      MR. LEE:  Fine, Your Honor.

17                        (Pause)

18      THE COURT:  Okay.  We may not have received the

19  certificate of no objection for Hunton & Williams, but the

20  orders apparently were docketed.  Oh, but not Hunton &

21  Williams.

22      UNIDENTIFIED SPEAKER:  Not Hunton & Williams.

23      THE COURT:  Oh, because we're waiting for the CNO.

24      MR. LEE:  Okay.  I will check with Ms. Crocker on

25  that then.  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I apologize.  I thought they were all

2     entered including that one, so I'm sorry, Mr. Lee.

3          MR. KAMENSKY:  Good morning, Your Honor.  This is

4     Andrew KAMENSKY with Hunton & Williams on the line.

5          THE COURT:  Yes.

6          MR. KAMENSKY:  With this matter concluding, may I be

7     excused?

8          THE COURT:  Yes, sir.  Thank you.

9          MR. KAMENSKY:  Thank you.

10          THE COURT:  Okay.

11          MR. LEE:  Your Honor, Item Number 3 is the Chapter 7

12     Trustee's motion for contempt and to enforce a preliminary

13     injunction order and automatic stay.  Mr. Geron is here.

14          MR. GERON:  Yann Geron for the Chapter 7 Trustee.

15     Your Honor, I believe this matter has been largely addressed by

16     the Court.  I believe the Court has entered an order.  I do not

17     have a docket reference.  I'm sorry.  But the Court has entered

18     an order that I saw.

19          THE COURT:  It's Docket 689, I believe.

20          MR. GERON:  Which addresses these issues

21     substantively directs payments directly from the bank to the

22     condominium.  So I think the only issue that I wanted to draw

23     to Your Honor's attention -- and I think the bank's counsel can

24     do the same if he's on the line -- was that there was in

25     addition to the discontinuance of the matter that was brought

 1    to the Court's attention last time, which was a matter that

 2    predated the July 22 calendar.  There was actually another

 3    matter apparently started by Dawn Prosser in State Court

 4    against the bank on August 13th, which was for a TRO, and I

 5    would suggest -- at least I would assume or I'd like to assume

 6    that the order contemplated discontinuance of that -- of all

 7    matters against the bank in connection with this, because it is

 8    the same jurisdictional issues and the same jurisdictional

 9    argument.

10             THE COURT:  Mr. Moorehead.

11             MR. MOOREHEAD:  Yes, Your Honor.

12             THE COURT:  I thought that Ms. Prosser was

13    withdrawing the actions against the bank, because this issue

14    had been resolved when the bank was ordered to make the

15    payments that she was requesting.

16             MR. MOOREHEAD:  No, Your Honor, that's not our

17    position as we indicated when we were discussing the language

18    in the order.  I am in receipt of the Court's order, Docket

19    Number 689, and it's under consideration.

20             THE COURT:  No, I ordered at the last hearing, I

21    thought -- I haven't checked the transcript, but if somebody

22    has it, we can view it, and, Mr. Moorehead, I believe that Ms.

23    Prosser through you indicated that the actions against the bank

24    would be terminated, because, in fact, what they were seeking

25    was payment of these condo fees, and I agree with Ms. Prosser

                        **J&J COURT TRANSCRIBERS, INC.**

1  that the condo fees should be paid.  And so, therefore, there

2  is no need for those actions.  So I ordered that the actions be

3  terminated and the bank be directed to make the payments.  I

4  thought, as a result of her agreement, that that was what was

5  appropriate to be done.

6        MR. MOOREHEAD:  No, Your Honor, I -- my exact words

7  at the last omnibus -- I'm sorry if I was misunderstood -- was

8  that I would recommend to Ms. Prosser, but we are in receipt of

9  the Court's order.

10        THE COURT:  Then I will terminate this order until I

11  make sure that the bank actions are withdrawn, because there is

12  no point to having a State Court adjudicate whether or not the

13  bank is required to make these payments when I've already

14  ordered the bank to do it.  So if you're going to pursue the

15  action in the State Court, I will relinquish the jurisdiction

16  to the State Court, and the condo fees won't be paid until the

17  State Court determines whether or not they should.  So if Ms.

18  Prosser is not going to withdraw those actions, then two courts

19  shouldn't be looking at the same issue.

20        MR. GERON:  Your Honor, may I be heard on that?

21        MR. HOLCOMBE:  Your Honor, this is Justin Holcombe.

22  If I could also be heard?

23        THE COURT:  Mr. Geron.

24        MR. GERON:  My concern, Your Honor, is that the

25  actions which Ms. Prosser has started in State Court seek,

1   apparently, a determination as to the ownership of Northshore

2   Realty Corp., and the problem that we have is that that issue

3   is sub judice now before this Court.  So what we're concerned

4   about is that is that there be now either a confusion if not an

5   argument later down the line of collateral estoppel or some

6   other comity issues that Ms. Prosser is going to raise on that

7   issue based on their arguments in State Court.  We think that

8   issue has been fully briefed, evidence has been presented to

9   this Court, and that ought to be something that is exclusively

10  within the jurisdiction of this Court.

11          THE COURT:  To the extent that this Court is looking

12  at whether or not that asset is property of this estate, this

13  is the only court that has jurisdiction over it, so the State

14  Court can't adjudicate that issue.  So at this point I don't

15  know what the State Court could do with respect to that.  This

16  Court is determining whether it is property of the estate or

17  not.  Mr. Holcombe.

18          MR. HOLCOMBE:  Your Honor, I think Mr. Moorehead has

19  incorrectly stated what happened at the last hearing.  I have

20  the transcript in front of me, and it appears to me that he

21  agreed to the order as entered.  He keeps filing a number of --

22  at least two actions on the same issue in the Superior Court,

23  and I'm afraid that if -- if left to the State Court, he will

24  multiply those proceedings and also attempt to continue in the

25  same fashion in the State Court.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  Well --

2            MR. HOLCOMBE:  I hope it --

3            THE COURT:  Mr. Holcombe, my understanding from the

4    last hearing was that Ms. Prosser -- and, in fact, I asked Mr.

5    Prosser's counsel, and to the extent he had an interest,

6    although he said he didn't have an interest, as I recall, and

7    he agreed that the actions could be withdrawn, because the

8    issue was to get the condo fee paid.  And so I was asserting

9    jurisdiction to make sure that the condo fee got paid.  If the

10   parties want to fight about it somewhere else, they can fight

11   about it somewhere else, but then the condo fee won't be paid.

12   And if a foreclosure action starts, then a foreclosure action

13   starts.  It makes no sense to me, but if that's what the

14   parties want to do, fine, that's what the parties can do.

15           MR. HOLCOMBE:  Your Honor, we've already -- based on

16   your order, we've already contacted the condo association and

17   have begun the process of getting those fees paid.  And based

18   on our discussions with them, the situation was that they

19   weren't -- Ms. Prosser wasn't in as much of arrears as she

20   stated.  Some of the rental proceeds from the condo had been

21   used to pay down some of the condo fees, and we were in the

22   process of remedying the remaining fees.  So, you know, we've

23   already taken the initial steps, Your Honor.

24           THE COURT:  Well, Mr. Moorehead, I have to review the

25   transcript, but my recollection is very clear that you agreed

1  that that was going to be the result.  So please review the

2  transcript, because if I'm in error, then I'll back off this,

3  and we'll figure out something else to do.  But if I am

4  correct, I expect that counsel will make representations before

5  this Court and then honor them.  Mr. Holcombe, you said you

6  have the transcript there.  I don't.  Can you read the

7  language?

8           MR. HOLCOMBE:  Yes, Your Honor.  Let me go to that

9  part.  One moment, please.

10                              (Pause)

11          MR. HOLCOMBE:  You said, "All right.  Mr. Moorehead

12  and Mr. Geron, how much time will it take for you to try to

13  work out an order?"  One moment.  Mr. Moorehead said, "Your

14  Honor, this is Jeffrey Moorehead.  I believe I could get the

15  figure from FirstBank's counsel, and we could move

16  expeditiously before the next omnibus hearing."

17                              (Pause)

18          MR. HOLCOMBE:  Your Honor, it might take me a moment

19  to find the statement.

20                              (Pause)

21          MR. GERON:  Your Honor, may I help with this?

22          THE COURT:  Go ahead.

23          MR. GERON:  I have a citation.  Mr. Stassen filed a

24  certificate of counsel in connection with an unconsented to

25  order that we had submitted to the Court for consideration, and

1  it states as follows, "The Court asked -- in transcript

2  7/22/09, Page 92, Lines 13 through 17 -- the Court asked, 'Do

3  you think you can come up with an actual -- with actually an

4  order that will require Ms. Prosser to or indicate that Ms.

5  Prosser will dismiss that action, so that it's clear that this

6  Court can enter an order that will direct payment of the funds

7  out of the fund in the condominium association?"

8        The response, which is at transcript Page 92, Lines

9  19 and -- through 93, Line 5, from Mr. Moorehead.  "Your Honor,

10  I will find out the exact amount that's owed in condominium

11  dues and assessments as of August 1, 2009," there is an

12  ellipsis, "and I will call counsel and hopefully with

13  instructions that -- the instructions that you've just given we

14  can hammer it out and the action will be dismissed immediately

15  without prejudice, so that if this happens again, we'll have to

16  protect her interest, Your Honor," and then there's an

17  ellipsis, "as a shareholder of the corporation."

18        THE COURT:  Okay, Mr. Moorehead, that seems to me

19  that Ms. Prosser said that she would dismiss this action

20  without prejudice in the event that the issue came up again,

21  which is clearly proper.  If it comes up again, she has a right

22  to make sure that her interest in that fund -- and that the

23  fund is used to -- for the purpose that it's intended, which is

24  to pay the fee.  So I'm at a loss.

25        MR. MOOREHEAD:  Your Honor, I distinctly recall

1  stating that I will recommend that it be dismissed without

2  prejudice.  I don't have the transcript before me, but I

3  distinctly remember stating that.

4          THE COURT:  Well, apparently, it's not on the

5  transcript.  You could take a look, Mr. Moorehead.  By tomorrow

6  I want a quote and a line and page, because if, in fact, that's

7  what's happening and Ms. Prosser is not dismissing this, I'm

8  going to have the bank terminate whatever negotiations it has

9  ongoing.  I will relinquish the jurisdiction, and you folks can

10 fight this out in the State Court.

11         MR. GERON:  Can I just --

12         THE COURT:  We will put this on the agenda for --

13 when's the -- when is the emergency hearing set?

14         MR. LEE:  It's Wednesday I believe at 3:00 eastern.

15         MR. GERON:  I think it's the 3rd of September, Your

16 Honor.

17         MR. LEE:  2nd.

18         MR. GERON:  2nd, I'm sorry.

19         THE COURT:  September 2 at 3:00 p.m. eastern.  All

20 right.  This number, Item 3, is continued till September 2 at

21 3:00 p.m. eastern by phone, so that I can find out whether or

22 not this order has to be amended.

23         MR. GERON:  Your Honor, just one last comment, and

24 then I'll let it go.  We'll move on.  And that is that if this

25 is not just -- insofar as the actions in State Court are

1  concerned, this is not just about payment of the condo

2  association.  Those actions seek turnover of the entire corpus

3  in the bank accounts.  Just so we're clear, because that is the

4  -- that is really the issue here.  I think that Ms. Prosser

5  wants control of all of the funds in the account not just in

6  payment of the association but payment of other costs that she

7  wishes to pay at this point.

8          THE COURT:  Okay.  My understanding is that at the

9  moment there is an injunction against that.  The State Court

10 can't order something to be released that this Court has

11 jurisdiction over.  I am looking at this issue.  The briefs

12 haven't been filed yet with respect to that trial, so I'm

13 waiting for the briefs.  When I get the briefs, I will be

14 addressing the issue.

15         MR. GERON:  Thank you, Your Honor.

16                       (Pause)

17         THE COURT:  Give me a second, Mr. Lee.  I'm sorry.  I

18 need --

19         MR. LEE:  Sure, Your Honor.

20         THE COURT:  -- to get back to where I was here.

21                       (Pause)

22         THE COURT:  And when I say with respect to what's

23 going to happen with the condo fees, that is all I expect that

24 I would be releasing jurisdiction as to.  I'm going to address

25 everything else in the context of the briefs.  If I determine

1 that's the appropriate thing to do, I'll hear people on

2 September 2nd.  All right.  Number 4.

3          MR. LEE:  Yes, Your Honor.  Actually, this is a

4 grouping of items.  It would really be Numbers 4 through 8 --

5          THE COURT:  All right.

6          MR. LEE:  -- on the agenda.  The Court had asked for

7 a status conference to be held on the various discharge actions

8 which have been filed, which include, obviously, complaints by

9 Greenlight, the RTFC, Chapter 11 Trustee both on behalf of New

10 ICC and then separately on behalf of ICC, LLC and EMCOM, and

11 then the Chapter 7 Trustee.

12          The Court had instructed us to attempt to negotiate a

13 scheduling order that would then be presented either by

14 agreement or to resolve any disputes that might exist.  Mr.

15 Wilkes, who is here on behalf of the RTFC, assumed the laboring

16 oar, which we appreciate, in that, so I'm going to let him

17 address that in a minute.

18          I will say that there seems to be a general agreement

19 amongst all the parties that with respect to the February trial

20 date the Court had previously given us, that the Greenlight

21 complaint was unique and would not proceed as consolidated with

22 the others.  That was something the Court had inquired about

23 earlier.  I can report that we do have agreement of the parties

24 on that.

25          THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. LEE:  There are some other issues with respect to

2   the scheduling order itself, so I'm going to let Mr. Wilkes

3   have the podium at this moment, Your Honor.

4          THE COURT:  All right.  So, the other three would be

5   consolidated for --

6          MR. LEE:  Well, they're actually -- Your Honor,

7   there'll be, I think, technically four others because of the

8   Chapter 11 Trustee having filed separate complaints.

9          THE COURT:  Two separate ones.  Okay.  So, four of

10  the five will be going to trial in a, I'll say, consolidated

11  for trial only, not consolidating the actions basis.

12         MR. LEE:  We hope for discovery and trial.

13         THE COURT:  Okay.

14         MR. WILKES:  Thank you, Your Honor, Greg Wilkes on

15  behalf of the RTFC.  As a preliminary matter, Your Honor, Mr.

16  Bressie was here to address any regulatory concerns from the

17  status conference if he may be excused at the next break.

18         THE COURT:  Oh, yes.  He may be excused whenever he

19  wants to leave.  Thank you.

20         MR. WILKES:  Thank you, Your Honor.

21         MR. BRESSIE:  Thank you, Your Honor.

22         MR. WILKES:  So, just to clarify, Your Honor, on the

23  discharge actions, the Greenlight action is Case Number

24  07-3001, that will not be tried together.  The others are Case

25  Number 07-3011, 07-3012, 08-3011 and 08-3012.

**J&J COURT TRANSCRIBERS, INC.**

48

1        I think it's probably easiest for Your Honor if I

2   sort of do this backwards and go from the standpoints as to

3   what we disagree.

4        As Your Honor will recall, the RTFC submitted an

5   order under certificate of counsel that was agreed to by the

6   trustees for both Chapter 7 and Chapter 11 estate, and by the

7   RTFC.

8        THE COURT:  Yes.

9        MR. WILKES:  It was not agreed to by Mr. Abood.  The

10  principal disagreements to date are, the first is the discovery

11  closing date.  The proposed order submitted to Your Honor has a

12  proposed date of December 18th, 2009.  Mr. Prosser would prefer

13  that to be January 15th, for non-expert witness discovery,

14  including depositions.

15       I can go by these one-by-one and --

16       THE COURT:  Wait until I find the order, I'm sorry.

17       MR. WILKES:  Sure.  And I have a copy here, Your

18  Honor, if you'd like.

19       THE COURT:  I believe I have it with me.  Okay.

20  Trial is scheduled for when?

21       MR. WILKES:  Trial is scheduled for the week of

22  February 1st.

23       THE COURT:  Okay.  I have it here.

24       MR. WILKES:  It may be easiest, Your Honor, I took

25  that somewhat out of order.  Let's start with point Number 2,

**J&J COURT TRANSCRIBERS, INC.**

1  which is the dispositive motions.

2          THE COURT:  All right.

3          MR. WILKES:  The order provides for dispositive

4  motion deadline of December 15th, 2009.  Mr. Prosser would

5  prefer to have that be any time prior to trial.

6          THE COURT:  Oh, no.  I can't do that because then I

7  have to have witnesses show up and be prepared for trial if, in

8  fact, I haven't ruled on summary judgment motions.  I need the

9  summary judgment motions in advance.  If they're granted, there

10 won't be a trial.

11         MR. WILKES:  We're in agreement.

12         THE COURT:  The only thing is, how are we going to

13 have summary judgment motions on a dischargeability action

14 which is pretty fact intensive?

15         MR. WILKES:  Well, Your Honor, as you recall, already

16 has the RTFC motion for summary judgment --

17         THE COURT:  I do.

18         MR. WILKES:  -- and brief, which is under advisement.

19         THE COURT:  But, I can't decide it until I get

20 through the, at least the exemptions issue which is very close

21 to being done, but not done yet and the Palm Beach, which I

22 hope to have out this week sometime.  So, I can't even look at

23 that issue until those are done.

24         MR. WILKES:  Understood.

25         THE COURT:  And, frankly, unless there is some legal

50

1  issue, I don't see how the dischargeability section is subject

2  to summary judgment.  I mean, won't there be material facts in

3  dispute?

4        MR. WILKES:  We submit that there are not, Your

5  Honor.  And our motion for summary judgment contains numerous

6  counts that we believe can be decided solely on a legal basis.

7  And we believe that the dispute is solely with regard to the

8  legal analysis.

9        THE COURT:  All right.  Well, in any event, I can't

10  have summary judgment motions running up to the date of trial.

11  That makes no sense.  They have to be done in advance.

12        MR. WILKES:  And that's why we set it, Your Honor,

13  for December 15th, which we thought would give plenty of time

14  prior to the February 1st trial for responses and then for

15  hearings to be conducted.

16        THE COURT:  Mr. Abood, what's the debtor's position

17  here?

18        MR. ABOOD:  Your Honor, it's -- the debtor's position

19  is that given the overall time frames that are being discussed,

20  the discovery period is suggested to be quite condensed.  And

21  so the dispositive motion deadline is not viewed in isolation,

22  but regardless, given that discovery would, we've suggested,

23  would be ongoing into January, that would, obviously, be

24  relevant to filing of motions.

25        We're looking at a very condensed time frame, Your

**J&J COURT TRANSCRIBERS, INC.**

1    Honor, even from today through trial, especially given the

2    holiday season that comes in November and December.

3            THE COURT:  But, these actions have been pending.  I

4    recognize that trial was held off because we have to do these

5    things in a fashion that makes some sense and you can't try

6    everything at once.  But, I'm not sure at this point what the

7    issues are that require that much discovery.  The complaints

8    are really relatively simple, in their positions.  I don't know

9    that there aren't facts in dispute, but nonetheless, the

10   theories of the complaint and the issues on which they're based

11   are pretty simple and they're the same things that have been

12   going on in this trial since the beginning.  What more

13   discovery is there to do?

14           MR. WILKES:  And, in fact, Your Honor, there is a

15   provision in the scheduling order that allows for, and I think

16   Mr. Abood had already agreed, that discovery that had occurred

17   in previous trials, in the exemptions trial, in the fraudulent

18   transfer and turnover, would be allowed to be used in this,

19   which would greatly shorten any sort of discovery period that

20   we would need.

21           THE COURT:  What more discovery do you need, Mr.

22   Abood?

23           MR. ABOOD:  We haven't even had an exchange of Rule

24   26 documents, Your Honor.

25           THE COURT:  Yes, I saw something in here that built a

**J&J COURT TRANSCRIBERS, INC.**

1  date in for that.  Well, it says October 22.  Frankly, I don't

2  know why it has to wait that long.

3           MR. ABOOD:  That's one of our points of contention.

4           MR. WILKES:  I'm sorry, I didn't hear that.

5           THE COURT:  This says initial disclosures by October

6  22.  I don't know why it has to wait that long.

7           MR. WILKES:  Well, we had just put that in there, we

8  can certainly do that earlier, if we need to.

9           THE COURT:  I think it should be done much earlier.

10           MR. WILKES:  Okay.  Would, Your Honor -- I think one

11  of the proposed had been September 28th.

12           MR. ABOOD:  That's correct.

13           MR. WILKES:  Is that still agreeable to you?

14           MR. ABOOD:  Yes.

15           MR. WILKES:  Okay.  We can do September 28th.

16           THE COURT:  All right, that's fine.  Parties agree.

17           Okay.  But, aside from that, because I doubt that

18  there are going to be many surprises in the documents at this

19  point in time that lead to this issue, so aside from the

20  initial disclosures that should be made by September 28th, what

21  other discovery is going to be necessary?

22           MR. ABOOD:  Your Honor, I'm not that omniscient.

23  But, but just looking -- when I look at an order like this, I

24  look at the time frames and the types of issues involved and

25  the number of parties involved and the logistics involved.

**J&J COURT TRANSCRIBERS, INC.**

53

1  Obviously, everyone is not in one jurisdiction, not in one

2  state.  So, that's the concern.

3      Certainly, it's understandable that the Court would

4  want to see dispositive motions prior to trial, I understand

5  that.  I agree with the Court's comments that discharge is a

6  relatively fact-driven issue.

7      That said, if discovery does not close on December

8  15th, simply because that's when dispositive motions are due,

9  then I don't -- I would agree with the December date.

10     THE COURT:  Okay.  Well, discovery has to close at

11 some point, so that we can get the pretrial statements, and

12 witness list, and exhibits and everything else done in some

13 logical sequence.  So, closing it three weeks before trial for

14 fact witnesses if, in fact, you need expert witnesses, isn't

15 going to work.  Do you need -- is somebody going to be calling

16 expert witnesses?  If so, then it seems to me fact discovery

17 should end somewhere around December -- in December and if you

18 need expert witnesses, you need a little bit of time to do

19 that.  If you don't, fact discovery can probably go longer, or

20 it can go simultaneously with experts, however you choose.  So,

21 what's the position with respect to experts?

22     MR. LEE:  Your Honor, I would like -- this is Jim Lee

23 for the record.  Obviously, a final decision hasn't been made.

24 There's a possibility, I think it's less likely than likely

25 that we would have experts.  But, I do want to address the fact

1  discovery component because we shouldn't be kidding ourselves

2  here.  We have not only had, I think, probably all total 20

3  depositions.  We have had over 20 days of actual trial time

4  with the same witnesses that are going to be involved.  There

5  can't be many facts left to discover in connection with

6  dischargeability because they're all based on the same subjects

7  that we've been doing discovery on forever.  So, I just don't

8  see why we need an extensive amount of time for additional fact

9  discovery and why it can't be commenced, immediately.

10          THE COURT:  Mr. Abood?

11          MR. ABOOD:  Your Honor, we have asked that discovery

12  be allowed to commence, immediately.  The order proposed says

13  no discovery until after the Court's disposition or ruling on

14  the RTFC's summary judgment.

15          THE COURT:  Oh, absolutely not.

16          MR. WILKES:  That's not what the order provides, Your

17  Honor.  It provides --

18          THE COURT:  Okay.

19          MR. ABOOD:  That was one of the original proposals.

20          MR. WILKES:  Actually, that's not true.  It provides

21  that there is a status conference to be conducted on October

22  8th, and the reason behind all this, Your Honor, was that

23  because there's limited discovery that we think actually needs

24  to take place, upon the fact that there is a pending motion for

25  summary judgment that's been briefed and been argued, we didn't

1  think it was the proper use of --

2          THE COURT:  No, Mr. Wilkes.  If you want discovery to

3  end in December, it should start now, I agree with Mr. Abood,

4  you need some time.  And starting it after a status conference

5  in October and ending it in December, for two months, makes no

6  sense.

7          MR. WILKES:  Very well.

8          THE COURT:  So, it either starts now, or it extends

9  beyond December 19.  If it starts now or -- 15th, pardon me --

10 I don't see any reason why it can't close December 15, for fact

11 witnesses, if somebody thinks that you may need an expert.  If

12 you do, you need time built in here for expert witnesses.  So,

13 that's the question I asked, can I get an answer?  Mr. Lee

14 says, he doesn't think it's likely, but he's not sure yet.  Mr.

15 Geron?

16         MR. GERON:  Your Honor, I believe Mr. Stassen is

17 handling some of the coordination.  He may be on the line.  I

18 do know that we have talked about it.  Mr. Stassen, are you on?

19         MR. STASSEN:  Yes, I am.  Can you hear me?

20         THE COURT:  Yes.

21         MR. STASSEN:  Okay.  With regard to experts, as I

22 said today, I think the one expert that may -- the parties may

23 want to call would be, at least in the previous trial, the

24 court-appointed expert regarding the computer issue.  But,

25 beyond that, sitting here at this point, I don't think that

1  there will be other experts.

2         MR. WILKES:  And we're in agreement with Mr. Lee and

3  Mr. Stassen.

4         THE COURT:  All right.  Well, haven't the depositions

5  and the discovery with respect to the computer expert already

6  been taken?  I mean, he can't give an opinion as to the

7  ultimate conclusion with respect to whether something is

8  dischargeable or not,

9         MR. LEE:  There's one caveat to that, Your Honor.

10 The laptop, we've never done any discovery on Mr. Prosser's

11 personal laptop.  So, if you'll recall, all of that was done

12 with respect to the desktop in the library.

13        THE COURT:  Yes.  All right.  So, there may be some

14 additional work that -- well can't that get started if you're

15 going to do it now?

16        MR. LEE:  I see no reason we couldn't do that, Your

17 Honor.  But, obviously, I defer to other counsel.

18        THE COURT:  All right.  What about the debtor, Mr.

19 Abood?

20        MR. ABOOD:  Until I know who they're intending to

21 call, Your Honor, I'm not in a position to respond with regard

22 to whether we will need experts.  At this point in time, if

23 they were not calling experts, I don't expect that we would.

24        THE COURT:  Well, what about the court-appointed

25 expert with respect to whatever the computer analyses are going

57

1  to show, or need to show, will Mr. Prosser be contacting the

2  expert for that purpose?

3          MR. ABOOD:  It's not our anticipation to go beyond

4  what's already been discovered.  I'm at some what of a

5  disadvantage, Your Honor, because Mr. Craig is not available

6  and I don't think he's even on -- he's very ill, he's not

7  working, at all.  So, I am kind of in the dark a little bit on

8  some of the particulars of the issues.  I apologize for that.

9  His illness was sudden -- was a sudden onset.

10         Again, my understanding is that unless the movants,

11  the plaintiffs, are going to be doing further expert discovery

12  and proposed testimony, I don't anticipate us needing any

13  expert testimony.  We, obviously, may need it with regard to

14  verifying or rebutting whatever the proposed testimony is, but

15  I'm not in a position to say that at this time.

16         THE COURT:  All right.

17         MR. ABOOD:  I know that the laptop, I believe the

18  disks -- I think -- I don't know where the -- I think the data

19  has been preserved.  I agree with Mr. Lee, I don't think it's

20  ever been examined.

21         THE COURT:  All right.  What about this?  One second.

22         How about closing fact discovery, instead of December

23  15th, make it December 24th.  That adds a week and two days

24  that shouldn't, I think, too badly adverse -- I'm talking about

25  fact discovery.  That shouldn't too badly adversely affect

1  this.  Motions for summary judgment, if they're going to be

2  filed, can still be filed by December 15 because you will all

3  know by December 15 what additional discovery is out there.  By

4  December 24th you will have had to have had it scheduled before

5  then.  So, you'll still be able to file the motions for summary

6  judgment.  And the responses and things that need to come in,

7  would come in after the close of discovery anyway.  That should

8  work.

9        So, dispositive motions, December 15, fact discovery

10  December 24 and that will give you, I think until January 15 to

11  do any expert discovery.  That should be plenty, especially if

12  you're only looking at the possibility of one witness.

13        MR. WILKES:  And then, Your Honor, response dates on

14  the motion for summary judgment?

15        THE COURT:  I'm not there yet.

16        MR. WILKES:  Okay.

17        THE COURT:  I'm sorry.  What did I say for the

18  expert, January 15?

19        MR. WILKES:  January 15th.

20        THE COURT:  So, the expert reports would be due the

21  next week, January 22.  All right.  Responses to dispositive

22  motions would be due January 8th, replies limited to five

23  pages.  Let's make that also January 22nd because you will have

24  had the depositions and whatnot of the experts.  I think I gave

25  the expert report date as a wrong date.  You need that before

1 the depositions, not after.  Expert reports are going to be due

2 before the discovery deadline ends, not after.  So I have to

3 change that report date.

4         In any event, replies limited to five pages by

5 January 22, should give everybody what you need, because all of

6 the expert discovery will have been concluded by then.  So, the

7 identification of the experts should be made not later than

8 December 28th.

9         MR. LEE:  Is that also with the report, Your Honor?

10         THE COURT:  With the report.

11         MR. LEE:  Okay.

12         THE COURT:  Okay.  Then expert discovery closes

13 January 15, and I suppose if there are rebuttal reports, they

14 could be due by January 22, if there are going to be any.  I'm

15 not sure why there would, but, okay.  Then the replies can come

16 in the same day.  That should, I think, give everybody what you

17 need.  Is there any problem with that schedule from anybody's

18 point of view?

19         MR. WILKES:  On the experts or --

20         THE COURT:  So far -- as far as we've gone, so far.

21         MR. WILKES:  With hearings contemplated the first day

22 of trial, or hearings --

23         THE COURT:  On?

24         MR. WILKES:  On the motions -- on the dispositive

25 motions.  We'd, obviously --

60

1          THE COURT:  I'll have to give you a schedule for

2   that.  I'm hoping I can get it in the next week, but I'll have

3   to look to see.

4          MR. WILKES:  That would be our preference, if

5   possible.

6          THE COURT:  Okay.  Am I all right to keep going in

7   lotus notes?  Okay.  Let me get back to that, Mr. Wilkes, in a

8   moment.  Mr. Abood?

9          MR. ABOOD:  Your Honor, just to clarify.  Is it your

10  instruction that discovery is allowed to commence, immediately?

11         THE COURT:  Yes.

12         MR. ABOOD:  Thank you.

13         THE COURT:  Any problem with the schedule with that?

14         MR. ABOOD:  No.

15         THE COURT:  All right.  Let me see if I can get an

16  argument date.  Please don't file frivolous summary judgment

17  motions.  If there are material facts that are going to be in

18  dispute, don't bother with the summary judgment motions,

19  please.

20         I think we have Virgin Islands hearings scheduled for

21  January 29th, that's a little bit late, though.  But, I need

22  some time to read whatever the rest of the documentation is.

23  And if replies come in January 22nd -- the first day I have

24  available is January 27th, which is Wednesday.  We could do

25  these arguments, if you want, by phone that day.  That would

1 give me an opportunity, hopefully, to rule before the trial

2 would start the following week which, if they're granted and

3 trial is canceled, would give you time to cancel witnesses,

4 but, quite frankly, in a dischargeability and discharge action,

5 I'm having some difficulty understanding how there won't be

6 material facts in dispute.  Mr. Abood?

7          MR. ABOOD:  Your Honor, where would you be holding

8 court on the 27th?

9          THE COURT:  Here.  Here.

10          MR. ABOOD:  Okay.

11          THE COURT:  So, argument on January 27th, 9 a.m.,

12 prevailing eastern time in Pittsburgh, but do you want to do it

13 just by court call?

14          MR. LEE:  How about the option, Your Honor?

15          MR. WILKES:  The option would be preferable.

16          MR. LEE:  Agreed.

17          THE COURT:  All right.  It may be by phone.  I am not

18 going to have -- I shouldn't say "not", I'm not sure that I

19 will have video conference capabilities available that day.

20 So, everybody who isn't going to be in Pittsburgh, make

21 arrangements to appear by court call because I'm not sure that

22 I will have the video available that day.  Obviously, I'm

23 sitting here, I haven't asked for it.  So, I just don't know.

24          Okay.  What have I missed in terms of a schedule?

25          MR. WILKES:  I believe the --

1          MR. LEE:  Trial briefs.

2          MR. WILKES:  The final issue is the trial briefs,

3    Your Honor.  The order proposes to have trial briefs due, by

4    all parties, on January 27th.

5          THE COURT:  Frankly, folks, you know, I'm not sure

6    what you're going to tell me on the issues of discharge and

7    dischargeability by way of a preliminary brief.  I'd really

8    prefer to get post-trial briefs that tie the evidence into the

9    legal positions.  If there's something that you really want to

10   brief in advance, I'll read it, but --

11         MR. WILKES:  That's fine, Your Honor.

12         THE COURT:  Mr. Abood?

13         MR. ABOOD:  Yes.  My concern, Your Honor, being the

14   defendants in this case, was simply that we would have

15   requested a staggering, that we get plaintiffs briefs so we

16   know what we're responding to.  But, to the extent that there's

17   not going to be pretrial briefing, or trial briefing, then,

18   obviously, that eliminates that concern.

19         THE COURT:  Well, do you have a need for pretrial

20   briefing?

21         MR. ABOOD:  No, Your Honor.  I agree with you.  I

22   think you, obviously, heard a lot in this case already.

23         THE COURT:  All right.  So, let's -- instead of trial

24   briefs, let's just eliminate that, but I will expect post-trial

25   briefs once the transcripts are available, so that you can tie

1  the legal positions that you have into the evidence that you've

2  presented.

3        MR. ABOOD:  Sure.

4        THE COURT:  Okay.  What I do want, however, is a

5  pretrial narrative, and since I'm not going to get briefs, I

6  want it to be a bit more fulsome than normal.  So, I want to

7  know who the witnesses are that you will be calling, and a

8  paragraph or two about what they're going to testify about.  I

9  don't want all their testimony stated, but I want to know the

10 general topics.

11        I'd like all the exhibits pre-marked for

12 identification.  To the extent that I already have them,

13 somewhere, maybe you can come up with a way that you don't have

14 to duplicate them again, but I don't know, because they are so

15 voluminous that -- what we have so far, that is -- is so

16 voluminous that it may be easier to cull the set and do a new

17 version.

18        What I may be able to do, to the extent that the

19 documents are already here in paper, is have you submit copies

20 of whatever you want to use on disk, rather than reformatting

21 the paper.  So, perhaps, you could give me, I'll call it a

22 chart, that would say -- I'm just making up a number -- TT-51,

23 is now Plaintiff's Exhibit 3 for the dischargeability trial.

24 And then, so if I have the chart I know where to go back in the

25 record that I already have to look for the exhibit.  But, I

1  will need that chart.  Then you could put them on a disk, with

2  the exhibit numbers that you're using for trial and I think

3  that may make life easier for everyone.

4      MR. LEE:  Your Honor, if I could make a suggestion.

5  Possibly, we can just retain the exhibit numbers that have

6  already been used in the other proceedings, because the Court

7  and the parties are very familiar with them and that might

8  avoid having any problems about what matches up with what.

9      THE COURT:  That would be fine with me.  Mr. Abood?

10     MR. ABOOD:  That's fine, Your Honor.

11     THE COURT:  Okay.  That probably works.  It still

12 might be a good idea to get them onto a disk, though, so that

13 we at least have a record for this trial of what the exhibits

14 will be.

15     MR. LEE:  That would be fine.

16     THE COURT:  New exhibits, if you're going to

17 introduce something that isn't already in the record, though, I

18 would like new binders with new markings, and also put them on

19 the disk, but I would like to have paper copies.  With doing

20 the proceedings here and in the Virgin Islands, it's easier to

21 have paper sometimes.  Yes, Mr. Abood?

22     MR. ABOOD:  Just a clarification with regard to Mr.

23 Lee's suggestion which, obviously, I agree with.  I think we

24 used different exhibit numbers in the exemptions, different

25 from the ones that we used in the turnover.  So, we probably

1  need to indicate to you which trial we're referring to.

2           THE COURT:  Yes, I --

3           MR. ABOOD:  For example, Ingrid Christian was TT-61

4  in the turnover trial, her summary, but there was a prior

5  summary from Ingrid Christian in the exemptions trial.

6           MR. LEE:  But, they're not identical, Your Honor.

7           MR. ABOOD:  They're not identical, correct.

8           MR. LEE:  That's the whole point.  If you continue to

9  use the -- how they were marked in whatever proceeding, then

10  we'll know what they were, and I don't have a problem with

11  saying turn over TT something or other, but I think they're

12  clear anyway.

13          THE COURT:  Well, the trustee's exhibits were marked

14  either as TE or as TT, but some of the TT exhibits were also

15  used in the exemption trial, but they are clearly marked either

16  TT or TE.  So, I think if you keep to that categorization,

17  you'll be fine and I don't think the debtors' exhibits, they

18  were in sequence, too.  I don't think there were a different

19  numbering system for the two trials.

20          MR. ABOOD:  I just don't remember.  So, that's fine.

21  As long as -- I just wanted to make sure that we were clear --

22          THE COURT:  Okay.  Yes.

23          MR. ABOOD:  -- as to what document we were talking

24  about.

25          THE COURT:  Yes.  I want you to be clear, too,

because otherwise I'll have to get back to you and say, what
are you talking about, so it would be helpful to have it clear.
But, if you put them on the disk, then it will be clear because
the disk itself will have the marking on it and if nothing
else, we can go back and find it there.

All right.  So, is everybody happy with putting
everything on a disk and giving me paper copies only of
anything that hasn't already been marked for identification?

You can use the markings for this trial, assuming I
have exhibits marked, even though it wasn't introduced into
evidence.  What was not relevant in the turnover exemption
trial may be in dischargeability.  I'm not saying that the
rulings I made in those trials apply to this trial, I don't
know.  This is a new ball of wax.

But, in terms of markings, you can certainly use the
preset markings.  Is everybody in agreement with that?

MR. WILKES:  Yes, Your Honor.

THE COURT:  Mr. Abood?

MR. ABOOD:  Yes.

MR. STASSEN:  Yes, Your Honor, on behalf of the
Chapter 7 Trustee.  This is Bill Stassen.

THE COURT:  Okay.  So, we'll just delete this trial
briefs and simply, if you would, put in a sentence that says
that post trial briefing will determined at the end of trial

MR. WILKES:  Yes, Your Honor.

1          THE COURT:  Okay.  Pretrial narratives, then, I need

2   -- actually, I'd like to get them, if possible, by that January

3   22nd date because I'd like two weekends to be able to start

4   going through whatever it is that you're giving me.  I don't

5   know how voluminous the record will be from what I already

6   have.

7                          (Pause)

8          THE COURT:  So, January 22nd, for the disks and a

9   paper copy of the new exhibits.

10          What's easier for you, folks?  Where I need the paper

11   copy in advance of trial is here.  Obviously, where you will

12   need them for the witness and for me is in the Virgin Islands

13   for trial that first week in February, but they don't have to

14   go down before you, if you want to take them with you.  So,

15   that's the issue.  Where do you want them?

16          MR. WILKES:  It's a matter of Your Honor wanting to

17   haul all that paper down --

18          THE COURT:  I'm not hauling it, you're going to have

19   a second set for me there.

20          MR. LEE:  Two sets.  That's what we did last time.

21          MR. WILKES:  I was going to suggest that.

22          THE COURT:  Yes.  No, there's -- it's virtually

23   impossible.  You'll just have to send them down.

24          MR. WILKES:  Yes.

25          MR. LEE:  If I understand the Court, you're saying,

1 as long as we get everything to you in Pittsburgh by the 22nd,

2 we can have until the beginning of trial to get it down to the

3 islands?

4          THE COURT:  Well, I don't know what type of law clerk

5 assistance I'm going to have down there in February, and so, I

6 think it should be sent down -- well, if you're going to take

7 it there the day of trial, then you need to have somebody who

8 is going to be able to set it up in some logical fashion,

9 because I don't know whether I will.

10          MR. LEE:  Absolutely.

11          THE COURT:  Otherwise, it should go down a couple of

12 days before.  So, you want to take it, I'll just say it's due

13 the day of trial, but you'll have to have somebody there to

14 assist.

15          MR. LEE:  Fine.

16          THE COURT:  I think we -- Mr. Moorehead, are you

17 still there, or did we did lose the picture?

18          MR. MOOREHEAD:  Your Honor, we lost the reception --

19          THE COURT:  Okay.

20          MR. LEE:  There he is.

21          THE COURT:  Oh, okay.  Mr. Moorehead, you back?

22 Your microphone is muted, sir.

23          MR. MOOREHEAD:  Yes, we had a power outage, Your

24 Honor, I'm sorry.

25          THE COURT:  Okay.


**J&J COURT TRANSCRIBERS, INC.**

1              MR. MOOREHEAD:  It's back on.

2              THE COURT:  Did you miss anything from when I saw

3    you, your picture terminate --

4              MR. MOOREHEAD:  No.  No, it was only about five

5    seconds.

6              THE COURT:  Okay.

7              MR. MOOREHEAD:  Just about five seconds.

8              THE COURT:  All right.  So, what else in the

9    discovery order then?

10             MR. WILKES:  I believe that's it, Your Honor.

11             MR. ABOOD:  Agreed.

12             THE COURT:  Mr. Stassen?

13             MR. STASSEN:  Yes, Your Honor, I think we're good.

14             THE COURT:  Mr. Lee?

15             MR. LEE:  Fine, Your Honor.

16             THE COURT:  Okay.  Then who is going to prepare a new

17   one?

18             MR. WILKES:  We'll prepare a new order, Your Honor,

19   and submit it.

20             THE COURT:  Okay.  I'll enter that order when I get

21   it on a certification of counsel from the RTFC then.

22             MR. LEE:  May we have a very brief break?

23             THE COURT:  Yes.  We'll take a five minute recess.

24             MR. LEE:  Thank you, Your Honor.

25                         (Recess)


**J&J COURT TRANSCRIBERS, INC.**

1          COURT CLERK:  Please rise.

2          THE COURT:  Please be seated.  Mr. Lee?

3          MR. LEE:  Yes, Your Honor.  That takes us to Item

4   Number 9 that is on the agenda.  It's FirstBank Puerto Rico's

5   renewed amended motion for relief from stay.  The Court had

6   scheduled a status conference and pretrial hearing today and on

7   August the 7th, FirstBank filed a motion for ruling on its

8   renewed motion for relief from stay.  So, I think I heard Mr.

9   Holcombe on the line and I'll turn it over to him.

10         THE COURT:  All right, one second, please.

11                         (Pause)

12         THE COURT:  Okay, Mr. Holcombe, I'm with you now,

13  thank you.

14         MR. HOLCOMBE:  Your Honor, this is Justin Holcombe

15  for FirstBank.  At the last hearing, as you may recall, Your

16  Honor stated that if the trustees don't contest the value and

17  do not contest the liens, that there wouldn't be a need for an

18  evidentiary hearing and that FirstBank could simply inform the

19  Court that there was no longer an issue as to valuation and

20  that the Court would then enter an order on the basis of the

21  submissions of the parties at that stage.

22         Following the hearing, I contacted both of the

23  trustees to determine whether or not there were, in fact,

24  competing appraisals and whether or not competing appraisals or

25  appraisal at all -- or appraised value at all was the issue

**J&J COURT TRANSCRIBERS, INC.**

1    with regard to our motion for relief from stay.

2           As stated in our motion for a ruling, both trustees

3    indicated that valuation was not the issue and that there was

4    no competing appraisal on record before or afterward with

5    respect to this property.  So, as it stands, there's only -- as

6    relates to the collateral for FirstBank, there are only two

7    appraisals that have been submitted over the past year and a

8    half that our motions have been before the Court and both of

9    those appraisals are FirstBank's appraisals, both of those

10   appraisals at this stage would indicate that based on the liens

11   that are recorded against the property, relief from stay is

12   warranted at this stage.  And given the fact that valuation is

13   no longer an issue and the fact that the liens exceed the value

14   of the property, we would contend that relief from stay is

15   warranted and that there's no need for an additional hearing,

16   evidentiary or non-evidentiary.

17          THE COURT:  All right.  Mr. Geron?

18          MR. GERON:  Thank you, Your Honor.

19          I think what was stated by Mr. Holcombe is, at least

20   as to the status, is largely in accord with my understanding,

21   as well.  That is, that we were to see if there were additional

22   competing appraisals and, indeed, I was not sure at the last

23   hearing whether the trustee, the Chapter 7 Trustee had obtained

24   another appraisal.  I confirmed -- we confirmed to Mr. Holcombe

25   that we do not have another appraisal and, therefore, that at

1  least as to the valuation and the lien structure, there may not

2  be a contested issue.

3          That said, I think, and I may be misstating the facts

4  here, but I think that when Mr. Holcombe talks about the liens

5  he may also be talking -- he may be including in that, in terms

6  of the equity of the estate analysis, the RTF -- at least in

7  the first motion there was some discussion about the RTFC's

8  lien which was an MLC -- I'm sorry, a Merrill Lynch issue that

9  Your Honor will be familiar with.  You will recall, that is

10 that, do we count that lien or not count that lien, and I think

11 in connection -- not in connection with FirstBank but in

12 connection with Merrill Lynch, an argument was made whether

13 that lien ought to be counted or not in terms of the overall

14 equity of the estate in that property and it was, I think,

15 conceded by the RTFC that that lien was not, in fact, perfected

16 in time and, therefore, would not be counted.

17         That said, we will concede that the Chapter 7 Trustee

18 does not have the wherewithal to make the payments.  And what

19 we are concerned about is that if adequate protection payments,

20 in a vacuum, that is in the context of protecting the claim of

21 the bank is really the issue, then we would have and did submit

22 in connection with our motion, that it was, in fact, the

23 Prossers' purview and requirement that they pay since they're

24 occupying the property.

25         If they are getting the use and benefit of the

**J&J COURT TRANSCRIBERS, INC.**

1   property, they ought to pay and if they are not paying, then I

2   think we have a real issue here, but the issue rests on their

3   shoulders, not on the trustee's shoulders, in the first

4   instance.

5          And then lastly I would submit to Your Honor that

6   based on the valuation, at least in the first instance, in the

7   first motion, we argued that for purposes of 362(d)(1), there

8   was adequate protection, at least at the time.  And so I think

9   that since there is a second valuation at this point, it was

10  our understanding that while we do not have a competing

11  valuation, we also don't have the evidentiary record.  We have

12  submissions by counsel, but we do not have the evidentiary

13  record.  And I, at least, understood it at the time, from July

14  22, that we were to schedule an evidentiary hearing on those

15  issues.  But, again, I understand what Mr. Holcombe is saying,

16  which is that since there is no competing appraisal that that

17  may constitute the evidentiary record.

18         What we were concerned with is, and we've always

19  argued that it was the consolidated sale of this property that

20  was ultimately the best use and value of the property and we

21  sort of -- we touched on that back in January when this motion

22  was initially ripe and when we thought we were going to have a

23  settlement with the Prossers.

24         And so, you know, I don't know whether my

25  understanding was correct, but I thought that in the context of

1 an evidentiary hearing, that at least the evidentiary record

2 would be completed with respect to the lifting of the stay.

3 Again, at the end of the day, the trustee does not have the

4 wherewithal to make the adequate protection payments,

5 particularly because the issue of ownership remains at large

6 and so, we would submit that the burden of paying the adequate

7 protection, the burden of paying for occupancy of the property

8 ought to be shifted onto the Prossers while this issue

9 continues.

10         THE COURT:  All right.  Mr. Wilkes?

11         MR. WILKES:  Just a point of clarification, Your

12 Honor, with regard to the RTFC liens.  I believe what we have

13 stated in the past is that we agree that the liens were filed

14 post-petition as to Mr. Prosser, but, obviously, prepetition as

15 to whatever interest New ICC has in that property.  So, we have

16 never taken a position whether they are valid or not.  We

17 simply stated that we filed the liens pursuant to the terms and

18 conditions after July 31st.

19         MR. GERON:  My apologies if I misstated that, Your

20 Honor.  That's my recollection, as well.

21         THE COURT:  All right.  Mr. Lee?

22         MR. LEE:  Yes, Your Honor.  I think that Mr. Geron

23 touched on most of the issues.  My statement to the Court at

24 the last hearing concerning the existence of another appraisal

25 was based on my understanding that the Chapter 7 Trustee had,

1  in fact, commissioned such an appraisal.  I later learned that

2  that appraisal was never followed through with and so it did

3  not exist.  So, I think Mr. Holcombe is correct.  To my

4  knowledge, the only appraisals that have been done are those

5  that were done by FirstBank.

6       THE COURT:  Well, that wasn't what I understood you

7  to be arguing at the time, Mr. Lee.

8       MR. LEE:  Right.  I understand, and I clarified with

9  the Chapter 7 afterwards.  We did not have an appraisal, I made

10 that clear to Mr. Holcombe right away.  I had been under the

11 impression that the Chapter 7 Trustee had commissioned one.  As

12 Mr. Geron just represented, he also had been under that

13 understanding at the time of the last hearing.  It was not

14 followed through with, which I was not aware of.  So, that's

15 why I thought there was another appraisal in existence.

16      Back to the FirstBank appraisals.  The last one, the

17 only one I've seen, had a $100,000 equity cushion in it.

18 That's what was discussed at the last go-round when we teed

19 this up.  I have never seen values in the second appraisal that

20 Mr. Holcombe has represented.  So I don't know if there is or

21 is not an equity cushion in these properties currently.  I

22 recognize that values have changed somewhat in the last year or

23 so in real estate.

24      So, our position has always been sort of consistent

25 with the Chapter 7's, that to the extent there's going to be a

1  sale of the properties, it does make better sense, since

2  they've always been treated as sort of a compound, for lack of

3  a better description, that they be sold in concert with one

4  another because of their proximity and the fact that some of

5  the related facilities are shared facilities.  But, we are not

6  in a position, obviously, to -- and don't feel, quite frankly,

7  that it falls upon us to make adequate protection payments.

8         THE COURT:  Mr. Abood?

9         MR. ABOOD:  Thank you, Your Honor.  Norman Abood, on

10  behalf of Mr. Prosser.  Our position is, I think the Court well

11  knows, is rather straightforward.  We consent to relief from

12  stay, we're prepared to deal with FirstBank in the territorial

13  -- the territorial courts.  And to the extent that there is

14  discussion about the applicability of liens, we would simply

15  ask that any order granting relief simply preserve those issues

16  so that they can be fully litigated, as opposed to making a

17  determination as to the applicability of liens at this point in

18  time.  Thank you.

19         THE COURT:  Well, I have to make a determination that

20  there is a basis on which relief from stay can be granted,

21  which has to mean that the creditor has a secured claim because

22  otherwise, I don't have a basis to grant relief from stay.  So,

23  is Mr. Prosser somehow or other contesting that there is a

24  properly perfected lien?

25         MR. ABOOD:  We agree with what Mr. Geron indicated,

**J&J COURT TRANSCRIBERS, INC.**

1  with regard to the liens.

2       THE COURT:  About the post-petition filing, you mean?

3       MR. ABOOD:  Yes.

4       THE COURT:  As to Mr. Prosser.

5       MR. ABOOD:  And that's as to RTFC, obviously.  We're

6  not -- we understand that FirstBank has a properly perfected

7  lien.

8       THE COURT:  Oh, so there is not a challenge to

9  FirstBank's lien position?

10      MR. ABOOD:  Correct.

11      THE COURT:  Okay.  Mr. Holcombe, I'm not aware that

12 the second appraisal, which is the one on which FirstBank

13 contends that there is not equity in the property, has been

14 filed.

15      MR. HOLCOMBE:  Your Honor, it has been filed.  We

16 filed it shortly before the May hearing.

17      THE COURT:  Okay.  The second appraisal?

18      MR. HOLCOMBE:  That's correct, Your Honor.

19      THE COURT:  Can you tell me the docket number?  I'm

20 sorry.

21      MR. HOLCOMBE:  If you'll hold -- let me see here.  If

22 you'll give me a moment, Your Honor.

23      THE COURT:  All right.

24                     (Pause)

25      MR. HOLCOMBE:  Docket Number 2470.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  In which case?

2          MR. HOLCOMBE:  In 06, thirty thousand nine.

3          THE COURT:  Okay.  And what's the value that's stated

4   there?

5          MR. HOLCOMBE:  $2,402,000 and -- no, $2,402,800, Your

6   Honor.

7          THE COURT:  And what's the amount of your client's

8   claim now?  Mr. Holcombe?

9          MR. HOLCOMBE:  Your Honor, one moment, please.

10         THE COURT:  Okay.

11                        (Pause)

12         MR. HOLCOMBE:  Your Honor, at this stage, it's well

13  in excess of that.  It's over 2.8 million.  We had submitted

14  evidence on that in our renewed motion and also in the motion

15  for ruling.  And so, it's on record, the exact basis for how we

16  had calculated our claim.  But, it's clearly in excess of the

17  2.4 million in the January 21st, appraisal, and given the lack

18  of payments since the appraisal in 2008, it's very well in

19  excess of the claim there, if you consider all the liens.

20         MR. GERON:  Your Honor, just so that we're clear on

21  the record --

22         THE COURT:  Mr. Geron, is your microphone on?

23         MR. GERON:  Sorry.  Can you hear me now?

24         THE COURT:  Yes.

25         MR. GERON:  I'm sorry.  Just so we're clear for the

1  record, the original motion stated that the claim -- if I have

2  it right, that the claim of FirstBank's lien, that is the first

3  priority lien was one million five.  This is -- I'm just

4  rounding the numbers -- almost one million six, as of, I

5  believe it was January 2009.  I just want to make sure that

6  we're clear that what's being stated is that FirstBank's lien

7  is now in excess of $2.8 million, or is the issue that it's --

8  that the total, the totality of the liens, including RTFC and

9  the mechanics' liens, is more than $2.8 million.

10         THE COURT:  That's what I'm asking.  What's your

11 client's claim?

12         MR. HOLCOMBE:  My client's claim -- oh, I'm sorry,

13 Your Honor, I misunderstood.  My client's claim as of October

14 2nd, was 1.54 million, plus attorneys' fees, and including the

15 other liens, the other liens against the property, it exceeds

16 the 2.8 million figure.

17         THE COURT:  With the other liens including the RTFC's

18 lien?

19         MR. HOLCOMBE:  Not including the RTFC's liens, Your

20 Honor.

21         THE COURT:  Well, I'm still a little unclear.  If

22 your client is in first position, and there's still an equity

23 cushion of nearly a million dollars, how your client is

24 entitled to relief from stay?

25         MR. HOLCOMBE:  Your Honor, our position is that based

1  on the law, all the junior liens must be considered in

2  determining whether or not to grant relief from stay.  If you

3  look at the case law, and I don't believe the trustees have

4  disputed this, you have to consider those liens.

5         THE COURT:  I have to consider all the liens to

6  determine whether the debtor has any equity in the property,

7  but determining that the debtor doesn't have equity, doesn't

8  mean that your client is still entitled to relief from stay

9  when there is adequate protection in the property, over and

10  above the amount of value that would stand to ensure your

11  client's collection of its full claim and it appears that your

12  client is still over-secured.  And to the extent that you're

13  trying to still charge interest and attorneys' fees against

14  this lien, your client is taking a position that it's over

15  secured.  So, how is your client entitled to relief from stay?

16         I have an objection, I don't know if anyone is

17  present, I should ask, from -- this was filed a very long time

18  ago from Artisan Design Group, Jerry Mann, Charlie Stone

19  Consulting, Reuter Mechanical, Artisan Stone and Woodworks, who

20  were mechanics liens' creditors, I believe.  Is anybody present

21  for any of them?

22             (No audible response)

23        THE COURT:  All right.  No one is here for any of

24  them.  But -- so, their position in this very old pleading was

25  that to the extent that the properties can be sold as a whole

**J&J COURT TRANSCRIBERS, INC.**

1  and, therefore, would generate additional funds, their claims

2  may, in fact, be paid even if they're subordinate to the first

3  lien, and that appears to be the case to the extent that

4  they're in a position subordinate to FirstBank.

5          MR. HOLCOMBE:  Your Honor, if I may cite a couple of

6  cases that support our position.  The <u>Nantucket Investors</u> case

7  which was a Third Circuit decision, stated that all

8  encumbrances are totaled to determine whether or not there is

9  cause to grant relief from stay.  There's a number of cases

10 that say that the concept of equity in the property is the

11 difference between the property value and total liens.

12         THE COURT:  I agree that the difference -- that how

13 you calculate equity is to determine whether or not the value

14 of the liens exceeds the market value.  I'm not contending

15 otherwise.  What I'm suggesting is that your client, which is

16 the moving party here, is still over secured.  And your client

17 is contending that it's over secured because it's still

18 charging interest and attorneys' fees.  So, if you're over

19 secured, how is it proper to grant relief from stay?

20         MR. HOLCOMBE:  Well, Your Honor, our contention on

21 that is just based on the case law that says it's proper to

22 grant relief from stay on the basis of the total liens.  That

23 would be our contention.

24         THE COURT:  Mr. Geron?

25         MR. GERON:  Your Honor, I think -- may I address it

**J&J COURT TRANSCRIBERS, INC.**

1  from here, Your Honor?

2          THE COURT:  Yes.

3          MR. GERON:  I think the difference here is that

4  (d)(1) -- it's 362(d)(1) versus a (d)(2) relief from stay and I

5  think the aggregate of liens is a (d)(2) issue.  And I think

6  for this particular case the Court can, in fact, consider

7  (d)(2) separately from (d)(1).  That is, (d)(1), there is

8  adequate protection to protect FirstBank and that's why I was

9  seeking clarification from FirstBank, there is something like

10  80 percent value still available out there to protect

11  FirstBank.

12          So, (d)(1) relief is not necessary at this point.

13  They can continue to aggregate their -- they continue to tack

14  on the interest, and the charges and the attorneys' fees,

15  insofar as they're over secured.  (d)(2), yes, it looks like if

16  all of the liens are taken into consideration, there may be an

17  issue with respect to whether the estate has equity in the

18  property and that's the cases that are being cited by Mr.

19  Holcombe.

20          But, in this particular case, because of the issue of

21  compound, as Mr. Lee said, that is that we can potentially --

22  that at least arguably, from the trustee -- the collective

23  trustees' perspective, the sale of this property, as a whole,

24  is a far value in -- leads to a far greater value than the sale

25  of the separate properties.  That (d)(2), at least in our view,

1  can be set to the side for the moment, at least insofar as

2  FirstBank, and then as Your Honor just reminded me, the

3  arguments by the junior lienors, that is that they were

4  concerned that having the senior lienor foreclose would yield

5  less value for them than potentially having an aggregate sale

6  or some sort of bankruptcy sale, further supports that

7  argument.

8            MR. ABOOD:  Your Honor, may I be heard?

9            THE COURT:  Mr. Abood.

10           MR. ABOOD:  Thank you, Your Honor, Norman Abood on

11  behalf of Mr. Prosser.  And I apologize for having less than

12  precise information about what I'm about to say, but my

13  recollection is that the Artisan liens are the subject, or at

14  least were the subject, of some adversary proceedings.  I

15  believe that the trustee, for example, has sought to set some

16  of them aside, at least to a certain extent.  There was an

17  adversary proceeding filed by the Artisans as a group, counsel

18  was out of Atlanta.  I'm not sure, as we sit here, of the

19  status of that proceeding.

20           And just a further caveat, Your Honor, to the extent

21  that there is -- and I'm not sure that it's being asked for,

22  it's being alluded to, some order that the other property not

23  encumbered by FirstBank be somehow joined with this proceeding,

24  obviously, we would object to that.  Thank you.

25           THE COURT:  Okay.  I'm sorry, I lose track of this

1  every time and so I apologize.  I don't know why I can't keep

2  this fact in my head, but I can't.  The property, the land --

3         MR. ABOOD:  FirstBank has a lien on what we've called

4  the beach house.

5         THE COURT:  Yes.

6         MR. ABOOD:  Merrill Lynch has a lien on what we've

7  called the grand estate, the mansion house, the larger home.

8  There is a strip of land that runs along the side of the

9  property that is jointly titled to Mr. and Mrs. Prosser.  Other

10 than that strip of land, all the property is titled to Mrs.

11 Prosser, only.

12        THE COURT:  Yes, but which house, if any, is on that

13 strip that's jointly owned?

14        MR. ABOOD:  Good question.

15        THE COURT:  That's what I can never remember.

16        MR. ABOOD:  I can't -- I don't recall with precision

17 enough to make a representation to the Court.  Perhaps Mr.

18 Moorehead will know.  I could check that.  That could be found

19 quickly, but I know it was put -- it was acquired to satisfy

20 some setback requirements -- building setback requirements.

21 Which property it's joined to, maybe Mr. Holcombe knows.  I

22 don't know off the top of my head.

23        THE COURT:  Some --

24        MR. HOLCOMBE:  Your Honor, I think that property that

25 you're speaking of is subject to Merrill Lynch's lien, not our

**J&J COURT TRANSCRIBERS, INC.**

1    lien.

2              THE COURT:  Okay.

3              MR. HOLCOMBE:  But, in any event, I think the -- one

4    of the issues that was raised at past hearings was that the

5    larger mansion encroached upon some of the property that is

6    subject to our lien by maybe a few feet or something like that.

7    So, there's a very minor encroachment onto the properties that

8    are subject to our lien.

9              THE COURT:  Okay.  Thank you.

10             MR. GERON:  One point of -- this is Yann Geron.  One

11   point of clarification, the issue raised by Mr. Abood is really

12   a 550 issue, that is, yes, there are claims that have been

13   asserted by the Chapter 7 trustee against some of the artisans

14   for recoveries of payments made.  Those claims have been put on

15   hold.  Those lawsuits have been effectively put on hold, all of

16   them, and scheduling has been stayed by -- with consent of the

17   Court -- by order of the Court pending determination of the

18   turnover and other claims that are now under the Court's

19   consideration.

20             So, and I'm not sure if this is a 550 issue in the

21   sense that I don't yet know whether recoveries will be had.  It

22   all depends on the determination of ownership.  We filed those

23   as -- because the statute of limitations was running on the

24   Chapter 7 estate, but insofar as the issue is under advisement

25   at this point, we are -- we've put all of those adversary

86

1 proceedings on hold.  So, it's really hard to say whether this

2 is a 550 issue, that is, whether there would be disallowance of

3 the claim pending recovery of the 547 claims.  We're not yet at

4 a place where we could determine that.

5          THE COURT:  Okay.  I'm just having some difficulty

6 with this still.  The values apparently are not disputed.  I

7 take it that no one expects that cross examination of the

8 appraiser or anyone else is going to bring in a material

9 difference in the values.  Do I understand that correctly, so I

10 don't need an evidentiary hearing?

11          MR. LEE:  That's correct on value, Your Honor.

12          MR. GERON:  That's correct, Your Honor.

13          MR. HOLCOMBE:  Correct.

14          MR. ABOOD:  Agreed on value, Your Honor.

15          THE COURT:  I'm sorry, Mr. Abood?

16          MR. ABOOD:  Agreed on value, Your Honor.

17          THE COURT:  Okay.  So, I can assume at this point

18 that the value of the property is the two point -- I'm sorry,

19 four million that's in the January appraisal?

20          MR. GERON:  From the --

21          MR. HOLCOMBE:  That would be our position, Your

22 Honor.

23          THE COURT:  All right.

24          MR. GERON:  From the Chapter 7 perspective for

25 purposes of this motion we would stipulate to that.

**J&J COURT TRANSCRIBERS, INC.**

1         THE COURT:  And that FirstBank's claim which as

2    everyone agrees is in first position, is that correct, too?

3    Everyone agrees that it's first position?

4         MR. LEE:  I have no reason to dispute that, Your

5    Honor.

6         MR. GERON:  Likewise from the Chapter 7 Trustee.

7         MR. ABOOD:  It is not disputed by Mr. Prosser.

8         THE COURT:  And that that claim is now -- I don't

9    know the exact number, a little over 1.5 million?

10        MR. HOLCOMBE:  That's correct, Your Honor.  The more

11   precise amount is set forth in our briefs.

12        THE COURT:  Yes.  Okay.  I have them here.  I just

13   wasn't leafing through them to try to find it.  So, in essence,

14   there is still at least 900 -- or approximately I should say,

15   $900,000 that stands to support FirstBank's claim.  I think

16   until there is some adjudication as to whether or not any or

17   all of this is property of this estate that relief from stay is

18   still not yet appropriate.  I do agree that FirstBank's

19   position to the extent that payments are not being made is

20   eroding and that your client is entitled to adequate protection

21   as a result.

22        The difficulty seems to be that no one is willing to

23   provide adequate protection and at a certain point in time this

24   equity cushion is not going to be sufficient to support

25   adequate protection.  But, I think it is sufficient for a

**J&J COURT TRANSCRIBERS, INC.**

1  couple of months until we get through the -- well, I don't know

2  if it will be until we get through the issues, but at least for

3  a couple of months to support FirstBank's claim.  And to the

4  extent that the parties are correct that somehow all of these

5  properties could be sold jointly and pay more to general

6  creditors that there is a reason not to grant relief from stay.

7         I don't know if they're correct in that view.  It's

8  possible that the Court won't rule that way, but I don't know

9  that yet.  So, even to protect the interests of the non debtor

10 parties, it doesn't appear that relief from stay is appropriate

11 now with an equity cushion for FirstBank of this amount.  If

12 this were a junior creditor whose interests are being somewhat

13 eroded, but again I don't know how much.  They're not here

14 complaining at this point, then I may have a different issue on

15 my hands.  But, I don't have that issue.  I have the first

16 lender in first position asking for relief when the equity

17 cushion will clearly exceed the amount of that lender's claim

18 and the lender is very much over secured.  I just don't think

19 under the facts and circumstances of this case that relief from

20 stay is appropriate now.

21        I'll take a look at the -- at any cases you want me

22 to take a look at, Mr. Holcombe.  If you want me to re-look at

23 this brief again and the cases in it, I will.  If you want to

24 give me additional cites, I'll take a look at those, too.  But,

25 that's -- I'm just having some difficulties seeing where relief

1  should be granted under the facts and circumstances of this

2  case.  So, is there anything specific you want me to look at?

3         MR. HOLCOMBE:  Your Honor, if I might be permitted to

4  submit a supplemental brief on the issue that you've outlined

5  at this hearing, that would be preferable.  I assume from what

6  you're saying you're most concerned with the fact that we have

7  an equity cushion at this point and --

8         THE COURT:  Well, a substantial equity cushion.

9         MR. HOLCOMBE:  -- and you believe relief from stay is

10 inappropriate because of that.

11        THE COURT:  Well, because of that and the contention

12 that because of the other issues concerning the encroachment of

13 the mansion, the fact that one of the pieces of property --

14 apparently not this one, but the encroaching property is also

15 built on a land strip that definitely the estate does have an

16 interest in.  There's no doubt about that because Mr. Prosser's

17 name's on it.  There is a dispute as to whether Mr. Prosser has

18 any ownership interest or the ICC estates have any ownership

19 interest in the rest of the property for all the reasons that I

20 don't need to go into on this record, but there isn't a dispute

21 as to that strip.

22        So, it just seems to me at the moment with an

23 approximate -- again, approximate $900,000 equity cushion to

24 let this get sorted out that your client's claim is not in

25 jeopardy.  And I agree that the equity cushion is eroding, so

90

1 that is not an issue either.  Mr. Holcombe, can you refresh my

2 recollection, what's the amount of the monthly payment on your

3 client's claim?

4          MR. HOLCOMBE:  The monthly payment's roughly $7,000 a

5 month.

6          THE COURT:  Okay.

7          MR. HOLCOMBE:  But, I don't have the exact figure in

8 front of me.  But, that's the rough amount, I believe.

9          THE COURT:  Okay.  That's fine.  So, it's eroding

10 roughly at the rate of 700 -- I'm sorry, $7,000 per month and I

11 don't have any argument with that contention either.  But, I

12 think I do need to see how it is that under these circumstances

13 relief is appropriate for FirstBank right now.  I agree at a

14 certain point in time the equity cushion will erode to the

15 point where it's not proper to hold off relief from stay, but

16 with $900,000 to go, that's a lot of $7,000 monthly payments.

17          So, how much time would you like, Mr. Holcombe?

18          MR. HOLCOMBE:  Your Honor, we could have the brief

19 within two weeks.

20          THE COURT:  Okay.  That's September 11.  Anybody else

21 want to brief this issue?  I'm really just trying to take a

22 look at some cases to see what the proper result is.

23          MR. LEE:  Your Honor, just like to reserve the

24 opportunity after seeing the brief that if we wanted to respond

25 in any fashion that we could do so, say a week.

**J&J COURT TRANSCRIBERS, INC.**

 1              THE COURT:  All right.  Any other party who wants to

 2   file a response brief must do so within a week.  And, Mr.

 3   Holcombe, if you just even want to give --

 4              MR. LEE:  Well, a week of receiving his, right?

 5              THE COURT:  Yes.

 6              MR. LEE:  Yes, okay.

 7              THE COURT:  By September 18th, sorry.

 8              MR. LEE:  That's alright.

 9              THE COURT:  Mr. Holcombe, if you just even want to

10   give me a list of cases to read, I don't want your client to

11   have to incur a great deal of expense again.  I just want to

12   take a look at the law.  So, it's up to you.  I'll take a brief

13   or I'll take a list of cases, whichever.

14              MR. HOLCOMBE:  Okay, Your Honor.  One quick point of

15   clarification, after receiving our briefs at that point would

16   the Court then make a ruling on our motion or hold another

17   hearing?

18              THE COURT:  No, I'll just make a ruling at that

19   point, Mr. Holcombe, unless you want some supplemental

20   argument.  I think I understand the parties' positions.  I just

21   want to see what -- how the law will play out with respect to

22   these facts.  So --

23              MR. HOLCOMBE:  Your Honor, that's acceptable to us.

24              THE COURT:  All right.  I'll just take the matter

25   under advisement then and issue a ruling once I have a chance

1  to take a look at the briefs.  So, I'll tickle that for the

2  week after September 18 and make sure that if any other party

3  submit a brief I have everything.  Okay.  Thank you.

4           MR. HOLCOMBE:   Thank you.

5           MR. LEE:  Your Honor, that brings us to Item Number

6  10 on the agenda.  This is the complaint for declaratory relief

7  that was filed by Trustee Springel against Trustee Carroll and

8  the Court had scheduled a status conference.

9           Your Honor, this is tied into some other matters that

10  are also later on the agenda, but essentially this was a

11  complaint to preserve the right of the New ICC estate or the

12  other two debtors that Trustee Springel represents.  To the

13  extent that any of the avoidance actions that the Chapter 7

14  Trustee had filed or was anticipating filing involved transfers

15  that we claimed were rightfully of our estate as opposed to the

16  Chapter 7 estate.

17           There have been continuing negotiations between the

18  estates concerning these matters.  I think -- and I would defer

19  to Mr. Geron and Mr. Wilkes, but I think we have an agreement

20  in principle now, so what we would ask is that agreement

21  contemplates that this be carried until those matters have been

22  resolved and hopefully then this adversary proceeding may well

23  be dismissed.  But, we've got to sort of see what happens in

24  the avoidance actions to know for certain.

25           So, if with the Court's indulgence what we'd like to

**J&J COURT TRANSCRIBERS, INC.**

1  do is just continue the status conference into the future.

2          THE COURT:  Well, that's all right except that what's

3  that doing with the trustee's ability to compromise or settle

4  any of the other actions that are filed?

5          MR. LEE:  That is -- that will be addressed as we

6  talk about these other items.  I can have Mr. Geron go ahead

7  and address that now if the Court would like to hear.

8          THE COURT:  Well, I would because --

9          MR. LEE:  Sure.

10         THE COURT:  -- otherwise I think this issue at some

11  point has to be determined --

12         MR. LEE:  They do dovetail, Your Honor.

13         THE COURT:  -- between the estates.  Okay.

14         MR. LEE:  They do dovetail, so --

15         THE COURT:  Mr. Geron?

16         MR. GERON:  Yann Geron for the Chapter 7 Trustee,

17  what Mr. Lee says is correct.  I think the one point of

18  clarification, the proposed stipulation, at least as

19  contemplated by the Chapter 7 Trustee may have -- may actually

20  have a -- may constitute a resolution of this adversary

21  proceeding rather than carrying it.  We are carrying it for

22  purposes of today, but when that stipulation is in it's final

23  form that may actually constitute a resolution of this

24  adversary proceeding, at least as an interim basis -- as a

25  procedural basis.  But, we can deal with that.

1          In terms of the Trustees -- the Chapter 7 Trustee's

2    resolution, these 9019 motions and these upcoming resolutions

3    of adversary proceedings, the issue as Mr. Lee said is the

4    overlap of certain transfers, that is, transfers that were made

5    nominally from ICC, but we take the position on behalf of or by

6    Mr. Prosser and Your Honor knows these arguments well.

7          The issue there -- the concern that the defendants

8    would have had and rightly so, was a release by the Chapter 7

9    Trustee alone would not be sufficient.  They needed a release

10   from the Chapter 11 Trustee and that is part of what's being

11   discussed here.  We think that given -- and I -- one last point

12   which is what Mr. Lee said in terms of the agreement in

13   principle.  That is, in fact, the case -- my understanding as

14   well.  We have an agreement in principle.  We just need to get

15   it down to paper.  Once we have that agreement in place.  Those

16   other matters will fall into place.  Those other settlements

17   will actually fall into place as well and most if not all of

18   the -- all -- I think all but one of the adversary proceedings

19   commenced by the Chapter 7 Trustee -- the Prosser Chapter 7

20   Trustee for avoidance on 547 and 549 grounds will be resolved

21   as a result of that.  There is just one, and I'll report to the

22   Court a little bit later, that still is in discussion phase.

23          But, everything else has been resolved in principle

24   subject to two things.  One, obviously, the Court's approval

25   and, two, the over -- this overlap and the how do we get this

1  release to be effective on behalf of both estates?  And I think

2  that this settlement in principle of this adversary proceeding

3  will put that into place.  Does that answer the Court's

4  question?

5          THE COURT:  Yes.  All right.  So, you want to carry

6  this until when now?

7          MR. LEE:  Well, I -- there -- because the terms of

8  this are still a little bit in flux maybe we can just carry it

9  to the next omnibus and then be able to report more

10  definitively to the Court because conceptually the only

11  potential disagreement I might have with what Mr. Geron

12  represented is that I thought this adversary may prove to be

13  the vehicle for the true up between the estates after all of

14  the avoidances were resolved and that needs to be ironed out.

15  So, we're going to need a vehicle to do that and since this is

16  already pending that may be the mechanism, but we haven't

17  reached a definitive answer on that yet, Your Honor, to be

18  honest.

19          THE COURT:  All right.

20          MR. GERON:  Yann Geron, Your Honor, that's fine.  I

21  only meant -- it was purely a procedural comment whether we

22  deal with it procedurally by keeping it tabled and leaving it

23  alone.  Clearly the true up still has to happen and it's not

24  intended to affect that in any way.

25          THE COURT:  Okay.  So, I'll just continue Item 10

1  until the next omnibus and then you can -- if you've got the

2  settlement done in time to get it on the schedule, fine.

3  Otherwise, you can just give me a status report and tell me

4  when you're going to get it on the schedule.

5        MR. LEE:  Very good, Your Honor.  Your Honor, that

6  takes us to Item 11.  This is the Chapter 7 Trustee's motion

7  for an order approving settlement of certain of the adversary

8  proceeding actions, of this one in particular, the Worth

9  Builders, so --

10       MR. GERON:  Your Honor, may I address from here?

11       THE COURT:  Yes.

12       MR. GERON:  This is Yann Geron again.  This is one of

13 those adversary proceedings where the Chapter 11 Trustee has

14 filed a limited objection for the same reasons I've just

15 outlined.  If we could have that carried to the next omnibus I

16 think these will -- this is one of the approvals that will

17 dovetail hopefully with the inter-estate -- the interim

18 resolution that I've been describing.

19       MR. LEE:  That's obviously agreeable to us, Your

20 Honor.

21       THE COURT:  All right.  Item 11 is carried to the

22 next omnibus.  Okay.  Mr. Lee?

23       MR. LEE:  Your Honor, Item 12 on the agenda is the

24 status conference on the Palm Beach adversary that the Court

25 has asked that we discontinue.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes, my status report is I hope to have

2    an opinion out this week.  If not this week shortly, but I

3    think this week.

4          MR. LEE:  Well, would the Court just for --

5          THE COURT:  Yes, just --

6          MR. LEE:  -- housekeeping want us to put it on the

7    next omnibus just in case?

8          THE COURT:  Yes, if an opinion is not out, that's

9    fine.  And if it is, you'll know it and it can be --

10          MR. LEE:  -- and we'll just drop it.

11          THE COURT:  -- drop it.  Yes.  But, don't change the

12    agenda numbers, please, after the agenda's filed.  If it comes

13    out after the agenda's filed, then just leave it on and --

14          MR. LEE:  Then we'll just --

15          THE COURT:  -- indicate that an order's been entered.

16    Okay.

17          MR. LEE:  Right.  We'll just update the status of it.

18    That's what we'll do.

19          THE COURT:  Thank you.

20          MR. LEE:  Sure, Your Honor.  That takes us now to a

21    series of matters the Chapter 11 Trustee actually began filing

22    avoidance adversary proceedings against several third parties.

23    And starting with Item Number 13, there are several of these,

24    Your Honor, that are set for pretrial conferences or status

25    reports to the Court as the case might be and I'll try to run

**J&J COURT TRANSCRIBERS, INC.**

1  through those.

2          The first one has to do with Stan Springel versus

3  Trump International Golf Club, Item 13.  And my understanding

4  is, is that we did reach a settlement.  I think the Court

5  actually entered an order on that when -- wait a minute, that

6  was an extension of the filing date.  I apologize.  We have, I

7  think, reached a settlement.  We've got to prepare a 9019.  We

8  needed to extend the response date to accommodate that and I

9  think on August 27th, the Court actually entered the order.

10          THE COURT:  That extended the time?

11          MR. LEE:  That extended the time.

12          THE COURT:  Yes.

13          MR. LEE:  So, I'm working -- I had on older agenda,

14 but I think some orders came in right after I had that.  So, I

15 wanted to make sure I'm -- so, presently we have an extended

16 answer date.  We hope to file a 9019 before the next omnibus.

17          THE COURT:  All right.

18          MR. LEE:  The next one, Item 14, is Stan Springel

19 versus Sir Ronald Sanders.  It had a response date of the

20 September 9th.  We also had a stipulation to extend.  I believe

21 the Court entered that August 27th and the new response date is

22 September 9th.

23          THE COURT:  Yes.  This one is continued until -- I'm

24 not sure if it's the next omnibus, but whichever omnibus is

25 after the response date.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. LEE:  I think actually, Your Honor, if I'm not

2  mistaken that we don't have one in September now.  I think

3  October is our next --

4          THE COURT:  Okay.

5          MR. LEE:  -- if I recall.  I think it's October 8th.

6          THE COURT:  All right.

7          MR. LEE:  Your Honor, that's brings us to Number 15

8  which is Stan Springel versus Thomas Alkon, A-l-k-o-n, and that

9  response date was August the 10th.  No answer was filed, but

10  there since, I think, has been some contact.  I'm not directly

11  involved in that one.  So, we will either -- we would ask that

12  the Court move this to the next omnibus and in the interim

13  we'll either file a motion for default or hopefully we'll have

14  something to report.

15          THE COURT:  All right.

16          MR. LEE:  Item Number 16, Your Honor, is Stan

17  Springel against Paul Arnold, Jr. and PACO Consulting.  We are

18  working on a tolling agreement presently with the defendants.

19  We'd ask that the Court reschedule this for the October 8th

20  omnibus.

21          THE COURT:  Okay.  It's continued.

22          MR. LEE:  Your Honor, the next one, Item 17 on the

23  agenda, is Stan Springel versus the Hotel Plaza Athenee.  The

24  response date had been August the 12th.  There's been no

25  answer, but I believe earlier before the commencement of the

1  hearing, counsel for this defendant was on the phone.

2          MR. ALBERT:  Craig Albert here for the Hotel Plaza

3  Athenee.

4          THE COURT:  Thank you.

5          MR. LEE:  And he made a request for evidence of

6  service.  We'll be glad to provide that to him.

7          MR. ALBERT:  Well, nevertheless -- that's -- if I

8  may, Your Honor, the first two orders in your pretrial order

9  have not been complied with.  The Court ordered first that the

10 summons be served within ten days of the date of its issuance

11 which is the ordinary rule for staleness of a summons.  It was

12 not.  It was served a week after that.

13         THE COURT:  Mr. Albert, are you on a speaker phone?

14 I'm having trouble --

15         MR. ALBERT:  No.

16         THE COURT:  You have to pick up --

17         MR. ALBERT:  No, Your Honor, I'm not.

18         THE COURT:  Okay.

19         MR. ALBERT:  Let me try and speak up a little bit.

20 Pardon me.

21         THE COURT:  Thank you.

22         MR. ALBERT:  The first order that the Court entered

23 was that the summons be served within ten days of its issuance

24 which is the ordinary period for staleness of the summons.  It

25 was not served within that period.  If it was served at all,

1 the certificate of service says that it was served a week after

2 that.

3          The second order that the Court entered said that the

4 certificate of service needs to be executed within ten days of

5 the issuance of the pretrial order.  It was not.  It was

6 executed on the -- on -- 15 days later.

7          And the third thing that the Court's order said was

8 that it would be filed within ten days of the date of the

9 order.  It was not.  In the Court's pretrial order it said that

10 if those were not complied with that the case would be

11 dismissed and I would ask Your Honor that the case be

12 dismissed.

13          THE COURT:  Mr. Lee?

14          MR. LEE:  Your Honor, I don't have any evidence in

15 the record of any of the things that Mr. Albert has raised and

16 I don't believe the Court does either.

17          MR. ALBERT:  It is in the certificate of -- it is in

18 the certificate of service that the trustee's counsel put in,

19 Your Honor.

20          MR. LEE:  Your Honor, if he wants us to serve him

21 again and file a new suit, we will.  Otherwise, he can just

22 answer.  This is the first I've heard from Mr. Albert is on

23 this call.

24          MR. ALBERT:  Your Honor, if I may, the first that the

25 hotel heard of this lawsuit was on Wednesday.  They have no

**J&J COURT TRANSCRIBERS, INC.**

record of having received the summons on this, and what we

received was a telephone call from a lawyer in the Virgin

Islands soliciting us to be represented by this lawyer in the

Virgin Islands.  The first we ever heard of this lawsuit was

two weeks after -- was two weeks after our response time had

already run.  And I don't think that it's a -- while the Court

may decide to give them leave to re-plead or to re-serve, I do

have to point out that in this instance this is a -- this is a

-- we're talking about a hotel that rendered services to this

-- to New ICC or Mr. -- the guest was Mr. Prosser.  So, there

can't possibly be much of a basis, a Rule 11 basis or an ICBA

Rule 8 basis for an allegation that there was a fraudulent

conveyance here.

So, Your Honor, I really would ask that the case be

dismissed.  I think that we should take seriously the Court's

orders with respect to service.  Certificate of service plainly

evidences a -- plainly evidences noncompliance with the Court's

orders even at the opening stages of this case.

MR. LEE:  Your Honor, if Mr. Albert wants to file a

motion to dismiss that we can respond to, that's fine.  The

Court is well aware of the circumstances involving Mr.

Prosser's use of the hotel and we can get into the merits of

the case if he wants to answer procedurally one way or the

other.  But, his raising these matters orally at a status

conference is not the appropriate way to do it.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  I think under the

2   circumstances I'm not sure, frankly, what the theory of this

3   action is, whether it's a fraudulent conveyance or a

4   preference, but it's brought by, I think, New ICC not by Mr.

5   Prosser.  And to the extent that the -- I guess the issue is,

6   has the statute of limitations run if I dismiss this suit and

7   have you start it over.  Otherwise, I'll have you reissue the

8   summons.

9          MR. LEE:  I can't answer that, but I would prefer

10  that we just reissue, Your Honor --

11         THE COURT:  All right.

12         MR. LEE:  -- to be sure.

13         THE COURT:  That -- I'm assuming that they're --

14  well, you have -- there's a certificate of service that's been

15  filed, but the defendant's saying it didn't get the documents.

16         MR. LEE:  It -- I'll --

17         MR. ALBERT:  I'm saying that the hotel has no record

18  of having received it.

19         THE COURT:  Oh, well, that's a different issue.

20         MR. ALBERT:  That is.

21         THE COURT:  Okay.  I think at this point it would be

22  proper to reissue the summons just to make sure that everybody

23  is properly served.  Mr. Albert, do you want to accept service

24  on behalf of the hotel?

25         MR. ALBERT:  Yes, Your Honor, I will.

1          MR. LEE:  If I could simply ask that he provide us --

2    since he obviously knows how to reach us, with his contact

3    information, so we know how to get that summons to him.

4          MR. ALBERT:  I will be happy to.  To whom at Vinson

5    and Elkins should I -- with whom at Vinson and Elkins should I

6    communicate?

7          MR. LEE:  You can send it to me.  It's just

8    jimlee@velaw.com.

9          MR. ALBERT:  Excellent.

10         MR. LEE:  Thank you.

11         MR. ALBERT:  Thank you.

12         THE COURT:  All right.  One second.  I'm sorry, is

13   this 16?  I've lost track of --

14         MR. LEE:  Seventeen, Your Honor.

15         THE COURT:  Seventeen, thank you.

16         MR. LEE:  Yes, ma'am.

17         THE COURT:  All right.  The summons is to be reissued

18   and served with Mr. Albert accepting service.  A response to

19   the complaint is due 20 days after service on you, Mr. Albert,

20   and then put it on the next omnibus after the answer date,

21   please.

22         MR. LEE:  Okay.

23         THE COURT:  So, I'm not going to issue the pretrial

24   order again.  There's no point.  It says what it says and the

25   purpose really is to try to get discovery going, but once the

1  response is in, I expect you two to talk about discovery if

2  it's going to be necessary --

3          MR. LEE:  Absolutely.

4          THE COURT:  -- or settlement or whatever.  But, put

5  it back on the next omnibus for a pretrial conference.

6          MR. ALBERT:  Of course, Your Honor.

7          MR. LEE:  Certainly.

8          THE COURT:  All right.  Thank you.

9          MR. ALBERT:  May I be excused from the remainder of

10 the hearing?

11         THE COURT:  Yes, sir.  Thank you.

12         MR. ALBERT:  Thank you, Your Honor.

13         THE COURT:  Okay.  Mr. Lee?

14         MR. LEE:  That's Item 18 on the agenda which is Stan

15 Springel versus Lake Placid Real Estate.  My understanding is

16 the Court has entered an order approving the stipulation

17 extending time.  I believe the new response date is September

18 17th if I have that correctly.

19         THE COURT:  All right.  So, this is continued until

20 the next omnibus.

21         MR. LEE:  Your Honor, that takes us to Number 19

22 which is Stan Springel versus Prosser and Campbell.  This is

23 one of the matters that the Court referred to Judge Walrath.

24 Yes, this is one of the two.  This one and Number 20, I

25 believe, as well which is Stan Springel versus Raynor, Rensch

1  and Pfeiffer law firm, so --

2           THE COURT:  Yes, I have nothing to do with --

3           MR. LEE:  Right.  So I was going to say probably you

4  want us to just pull these off the agenda going forward.

5           THE COURT:  I do.  Yes.

6           MR. LEE:  All right.  They were included before we

7  had gotten the Court's order --

8           THE COURT:  Yes.

9           MR. LEE:  -- and, of course, we wanted to carry them

10  to make sure.  But, Judge Walrath has already entered status

11  conference orders --

12          THE COURT:  Yes.

13          MR. LEE:  -- on both of those.  Are you ready to

14  proceed, Your Honor?

15          THE COURT:  One second.

16          MR. LEE:  Okay.

17          THE COURT:  Yes.  Go ahead.

18          MR. LEE:  Your Honor, Item 21 is Stan Springel versus

19  Campbell and Levine, LLC.  We filed a notice of dismissal and I

20  believe the Court --

21          THE COURT:  It was entered.

22          MR. LEE:  -- has entered the order.  Okay.

23          THE COURT:  Yes.

24          MR. LEE:  Good.  I just -- make sure.  So, that takes

25  care of 21.  Twenty-two, Your Honor, is Stan Springel versus

**J&J COURT TRANSCRIBERS, INC.**

1 John Raynor and that's another one that's gone to Judge Walrath

2 and she has entered --

3       THE COURT:  All right.

4       MR. LEE:  -- has already entered an order scheduling

5 a status conference.

6       Your Honor, excuse me, that takes us now to Item 23

7 on the agenda which is the Chapter 7 Trustee's motion for

8 partial summary judgment in connection with the Klingerman

9 matter, so I'm going to turn that over to Mr. Geron.

10       THE COURT:  Thank you.

11       MR. GERON:  For the record, Yann Geron for the

12 Chapter 7 Trustee.  Your Honor may recall that on July 22, full

13 argument was had on -- was entertained on the summary judgment

14 motion.  At the conclusion of that argument, the Court

15 instructed the parties to try to resolve the matter lest -- or

16 to try to avoid appeals and the costs associated with those

17 appeals and that is, in fact, what the parties have tried to

18 do.  And it is not for lack of effort by the counsel, but this

19 matter insofar as I understand it, this matter is not

20 resolvable from Mr. Klingerman's standpoint.

21       So, therefore we are compelled to ask the Court for a

22 ruling at this point on that summary judgment motion.  The

23 Court will recall that it is the trustee's position that based

24 on collateral estoppel and what we have defined as the good

25 faith deposit order which is now final and unappealable that

1  four findings -- four findings of fact and conclusions of

2  law -- four findings, I'm sorry, of fact can be had and are

3  not -- cannot be objected to by Mr. Klingerman.  And they are

4  that the trustee complied with the bidding procedures, that Mr.

5  Klingerman agreed to be bound by the bidding procedures, that

6  Mr. Klingerman materially breached those bidding procedures and

7  finally that the estate was damaged by that breach.

8         One issue that dovetails with what appears on the

9  next agenda item is the damages sought here.  While the

10 issue -- the next agenda item is not ripe at this point for

11 determination, the claim by the Chapter 7 Trustee against Mr.

12 Klingerman was the differential between Mr. Klingerman's bid

13 assigned and bound and the runner-up bid as approved and sold

14 and that number was 850,000.  We then netted out the 200,000

15 already collected by the estate by the forfeiture of Mr.

16 Klingerman's deposit.  That was the theory of the case by the

17 Chapter 7 Trustee that on a contractual basis the recovery to

18 the estate would be that delta and that we would net out the

19 200,000.  So, therefore the requested relief at this point is

20 for judgment against Mr. Klingerman in the amount of 650,000.

21         THE COURT:  All right.  Mr. Klingerman's counsel on

22 the phone?

23         MR. HOOVER:  Yes, Your Honor, Adam Hoover on behalf

24 of John Klingerman.

25         THE COURT:  Go ahead, sir.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. HOOVER:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. HOOVER:  I will concur with Mr. Geron's

4 representation that we made a concerted effort to resolve this

5 matter without proceeding with any further litigation.

6 Unfortunately, we're not able to reach an accommodation and it

7 is Mr. Klingerman's position that the forfeiture of the earnest

8 money deposit is the sum which -- for which he is responsible

9 to the estate -- to the bankruptcy estate and asks that the

10 Court deny the trustee's motion for partial summary judgment at

11 this point.

12          THE COURT:  Okay.  Well, Mr. Klingerman's brief seems

13 to indicate that the basis on which he makes this assertion is

14 that he was somehow led to believe that he would be liable only

15 for a $200,000 forfeiture even though no contract was signed,

16 is that his position?

17          MR. HOOVER:  Yes, Your Honor.

18          THE COURT:  Okay.  Well, it seems to me that that is

19 a material fact in dispute.  Whether it's relevant to the

20 outcome is, frankly, what I don't know, because if there is no

21 contract, I don't know how there is a liquidated damages clause

22 that applies when there is no contract that has set one.  So,

23 that's where I'm losing track of this issue, Mr. Hoover.  Mr.

24 Klingerman seems to suggest that he's subject to this

25 liquidated damages provision in a contract he didn't sign.  So,

1 how can that be?  I don't think a $200,000 oral contract would

2 be authorized by the Statute of Frauds under these

3 circumstances, would it?  So, if there's --

4         MR. HOOVER:  I would certainly confer with the

5 Court's analysis.  Mr. Klingerman's position however, Your

6 Honor, is that the -- he relied on the bidding procedures which

7 trustee's counsel has quite properly indicated was the initial

8 step for Mr. Klingerman's purchase or attempted purchase of

9 this property.  The communications, I believe, which then

10 transpired between Mr. Klingerman to New York counsel -- Lake

11 Placid counsel and trustee's counsel, did not result in the

12 execution of a contract following the bidding procedures.  But,

13 nevertheless the bidding procedures clearly state that in the

14 event that Mr. Klingerman failed to perform and close on this

15 transaction, that the trustee would have every right to the

16 $100,000 earnest money deposit which I am to understand that

17 Mr. Klingerman, on advice of one of his New York counsel,

18 finally agreed to.

19         The unfortunate element in this situation is that Mr.

20 Klingerman's New York counsel did not participate in the

21 hearing when the Court ordered the forfeiture of the earnest

22 money deposit and then opened the door for the trustee to seek

23 additional damages.  This was not consistent, as I understand

24 it, with the proposed order submitted by the trustee, and

25 relied upon by Mr. Klingerman's New York counsel and was the

1  basis for their -- for his decision not to appear at the

2  hearing.

3          THE COURT:  Okay.  Well, the bid procedures have a

4  couple of references that I found -- I think I found them all,

5  to the good faith deposit.  The first is on Page 2 in what is

6  number -- or lettered Paragraph B.  It says, "Good faith

7  deposit payable to the order of Fox Rothschild, LLP, as

8  attorneys of $200,000."  That's one of the determinations of

9  what makes a qualified bid.

10         The next one is on Page 5 which talks about the

11  return of the good faith deposits and the first paragraph

12  basically says that the trustee will return the good faith

13  deposits of everybody except the first two highest qualified

14  bids which shall be returned only after closing.  The second

15  paragraph of that provision under, "Return of Good Faith

16  Deposits," says, "If a successful bidder fails to consummate an

17  approved sale because of a breach or failure to perform on the

18  part of such successful bidder, trustee will not have any

19  obligation to return the good faith deposit deposited by such

20  successful bidder and such good faith deposit irrevocably will

21  become property of the debtor's estate."  But, it is not a

22  liquidated damages provision.

23         So -- and, in fact, I think I went over this before.

24  I would not have approved this bid procedure if it had been a

25  liquidated damages provision when the bids were expected to be

**J&J COURT TRANSCRIBERS, INC.**

1  in excess of $2 million because of the appraisals that had been

2  performed on -- or the -- I'm not sure if it was a full

3  appraisal, but the trustee's estimate of the value of the

4  property.

5         You are correct that the order that was attached to

6  the trustee's motion asking to have that deposit turned over

7  did somewhere -- and if I can find it, indicate that that was

8  the extent of the responsibility that Mr. Klingerman would

9  have.  But, I refused to sign that order.  And then if I recall

10  -- and I don't think the order that I do have -- I'm not sure I

11  marked it -- I thought was directed to be served on Mr.

12  Klingerman's counsel, but my order is signed, is simply the one

13  that was docketed and I don't know for a fact whether it was

14  served on Mr. Klingerman.  Does somebody have a -- the

15  certificate that indicates whether it was or was not on him or

16  his counsel?

17         MR. GERON:  I do not recall, Your Honor.

18         THE COURT:  It was dated -- the order, that is, is

19  dated October 31 of 2008, but I don't have the certificate of

20  service.  If Mr. Klingerman or his counsel were served with

21  that order they should've appealed and that's what my concern

22  is.  If they did not appeal, then it's clear from that order

23  that it was not a liquidated damages provision.  I think it had

24  to be clear anyway because there was never a contract signed

25  that set a liquidated damages provision and that's not

113

customary breach of contract damages.  You have to contract for

that provision.  So, I'm -- I think I'm at a loss to understand

that that provides the defense.

         Having said that, I don't know that the issue of

damages is fixed.  Surely the customary breach of damages

action would be the difference between the two contracts less

any collection that the trustee had made against that breach,

so -- which would be obviously attributed as some form of an

offset against the total damage clause.  So, I think I'm at a

loss, Mr. Hoover, as to why partial summary judgment isn't

appropriate simply because although Mr. Klingerman disputes the

fact that the trustee somehow may have induced reliance I don't

know how you could have relied on a contract that wasn't

signed.  And as a matter of law I don't understand that that

fact in dispute would get me to a different resolution on the

issue of law.

         So, if I'm incorrect, then I think I need an

evidentiary hearing on that issue which is a material fact that

is in dispute.  But, I don't think that the fact that it's in

dispute is relevant to the outcome of the dispute.  That's the

problem.

         MR. GERON:  Your Honor, this is Yann Geron.  May I be

heard on that issue just very briefly?

         THE COURT:  Yes.

         MR. GERON:  I think that the -- that Mr. Hoover's

**J&J COURT TRANSCRIBERS, INC.**

1  comments about the reliance of his client don't -- were made

2  broadly with respect to communications had with Lake Placid

3  Realty which is the broker, Mr. Klingerman's New York counsel

4  and then separately with my firm and my co-counsel, my other

5  partner who was handling the closing on this.  I don't know

6  that the allegation goes so far as to say that there was a

7  representation by anyone at Fox Rothschild or on behalf of the

8  Chapter 7 Trustee that would have capped -- that said anywhere

9  at any point for any reason that the $200,000 was the cap of

10 all damages.

11       And, so I just draw the distinction between broad

12 communications had between three different parties or among

13 three different parties and Mr. Klingerman on one side versus

14 straight communications between my office and Mr. Klingerman or

15 Mr. Klingerman's counsel on the other.

16       THE COURT:  Well, I think, Mr. Hoover -- correct me

17 if I'm in error -- but I believe that the allegation is that

18 the draft documents that were being put forth back and forth

19 between the trustee and Mr. Klingerman's counsel, contained

20 some form of liquidated damages clause.  And, so Mr. Klingerman

21 is asserting that he's relying on those draft documents even

22 though he never signed them.

23       MR. HOOVER:  Well, yes.  In answer to that question,

24 yes, I would agree with that.  If I can step back though to Mr.

25 Geron's comments, I -- while I was not involved in these

discussions and communications, I agree with Mr. Geron's
assertion that his office did not formally communicate to -- at
that point it was Attorney Brooks representing John Klingerman.
And I certainly had no intention whatsoever to indicate in any
shape or form that there had been a representation by Mr.
Geron's office that the $200,000 earnest money deposit was the
sole source of forfeiture.

The reliance by Attorney Brooks that the $200,000
earnest money deposit would be the sole forfeiture was on the
basis of the proposed order which Attorney Brooks read to mean
that the $200,000 would be forfeited and he communicated then
to, I believe, Mr. Stevens, if I recall correctly.  I'd have to
look back into the email correspondence, indicating that Mr.
Klingerman had agreed to the forfeiture of the $200,000 deposit
and to please communicate accordingly to the Court at the
hearing.  And that is -- that was -- that's really the sum and
substance of the correspondence which led to Attorney Brooks
essentially agreeing to release the $200,000.

THE COURT:  Okay.  Well, that fact, i.e., that there
was a communication between Mr. Brooks and Mr. Stevens or
someone on behalf of the trustee indicating that Mr. Klingerman
would forfeit the deposit was brought to the attention of the
Court.  What -- but, in my view taking a look at the bid
procedures it didn't constitute liquidated damages and because
there was never a contract signed that said that it did

1  constitute liquidated damages, I don't see how it can.  That is

2  not the customary rule.  You have the contract for that

3  provision.  Otherwise, contracting parties are entitled to

4  prove their breach.

5       So, with that recitation on the record, I think the

6  partial summary judgment is appropriate.  Having said that I

7  think you parties should talk to try to see whether you can

8  resolve this issue without the need for further appeals.

9       MR. GERON:  Your Honor, if I may be heard.  Your

10  Honor made the same or similar comments on a slightly different

11  record, but similar comments last time and we did reach out to

12  Mr. Brooks.  And, again, it is not an issue of counsel having

13  difficulty communicating between each other and nor is it an

14  issue -- I mean, to put it -- a fine point on it I think that

15  Mr. Klingerman -- and I hope I'm not saying this incorrectly,

16  Mr. Klingerman is not open to a settlement discussion at this

17  point.  If I'm mistaken, I'm perfectly happy to renew the

18  discussion.

19       THE COURT:  Okay.  Mr. Hoover, the order that's here

20  that grants the summary -- partial summary judgment indicates

21  that the estate -- wait, I'm sorry.  Let me reread this a

22  second.  I'm not sure I can use this order because it contains

23  information with respect to issues about Dawn Prosser that I

24  don't think are really subject to this order at this time.

25       I think what is appropriate with respect to Mr.

**J&J COURT TRANSCRIBERS, INC.**

1 Klingerman is to get simply an order that adjudicates the issue

2 as to him because the Dawn Prosser issues are sort of off on a

3 different track, aren't they?

4           MR. GERON:  Yes, in fact, the Dawn Prosser issues

5 have been resolved --

6           THE COURT:  -- resolved.

7           MR. GERON:  -- in respect to this adversary

8 proceeding.  That's correct.

9           THE COURT:  Right.  But, didn't I enter -- did I

10 enter an order?

11          MR. GERON:  Yes, Your Honor.

12          THE COURT:  Okay.

13          MR. GERON:  I think that's --

14          THE COURT:  Okay.  So, how about giving me an

15 amended -- or not an amended, but a revised order then that

16 will simply deal with the partial summary judgment against Mr.

17 Klingerman and you can run it by Mr. Hoover to make sure that

18 he agrees that it accords my ruling.

19          My ruling is that all -- that based on the statements

20 of counsel and the affidavit of Mr. Brooks which I have read

21 and am considering, I do not believe that there is a basis on

22 which the Court should deny the motion for partial summary

23 judgment and therefore it will be granted because the material

24 facts at this point are not in dispute, that is, even to the

25 extent that -- I'm just indicating on the record, even to the

**J&J COURT TRANSCRIBERS, INC.**

1  extent that Mr. Klingerman contends that he was relying on some

2  communication from the trustee, he agrees that it was never

3  stated that the $200,000 damage clause would be a sole source

4  of forfeiture.  And for that reason the collateral estoppel

5  request by the trustee is appropriate.  The order was

6  unappealed.

7         Now, having said that, I want somebody to double

8  check to be sure that Mr. Klingerman or his counsel were

9  actually aware of that order at some point because that order

10 is final and unappealed, but I don't have a certificate of

11 service here at this time.  It's obviously not relevant right

12 now.

13        MR. GERON:  I don't know, Your Honor, whether it

14 was served.  I cannot speak to that.  I can say that I think

15 Mr. Klingerman was on the ECF notices for sure because I

16 think he had participated for what that's worth and I'm not

17 sure how that order was submitted.  And I knew it was

18 submitted in accordance with the Court's ruling.  I'm just

19 not sure how it was submitted.

20        THE COURT:  Okay.  Well, if he was on the ECF list

21 he should have received service from that ECF list, but I

22 think it -- I either -- I need some verification that, in

23 fact, he was provided with notice of that order because my --

24 part of my ruling is based on the fact that he took no action

25 to appeal and should have timely taken an action to appeal.

**J&J COURT TRANSCRIBERS, INC.**

1  If that turns out not to be the case, put this back on next

2  month's agenda.

3          MR. HOOVER:  And, Your Honor, I will communicate

4  with both Mr. Klingerman and Mr. Klingerman's respective

5  counsel concerning certificate of service.  I was not aware

6  of any of them being on the ECF system at all.  As a matter

7  of fact, I don't believe that Attorney Brooks is accustomed

8  to participating on ECF.  It's not his area of law.

9          THE COURT:  Well --

10          MR. HOOVER:  I will follow up with Mr. Klingerman

11  as well as his counsel.

12          THE COURT:  All right.  Well, in that sense if he

13  is not participating -- has not filed anything here then he

14  wouldn't be on the list.  If he has filed something, the

15  local rule should say that he's on the list and that's the

16  way he gets served.  And I'm also concerned about the fact

17  that he just simply decided not to appear at a hearing and

18  then didn't followup on the order.  It seems to me that when

19  you represent a party in interest you should at least have an

20  obligation to followup on that order.

21          So, in any event I'm not certain that there is

22  cause to not grant summary judgment even if the service was

23  improper, but I will consider it at the next hearing if, in

24  fact, there was no service.  So, if there was service I want

25  an order that grants summary judgment.  It seems to me very

**J&J COURT TRANSCRIBERS, INC.**

1  clear at that point that the collateral estoppel principles

2  will apply.  The order is final and unappealable and

3  unappealed.  If he was not served somehow then I want the

4  opportunity to rethink this.

5          In the meantime, I understand that the lawyers are

6  trying to settle this.  You need to have a heart-to-heart

7  with your clients.  Okay.  So, I'll either get an order or

8  I'll talk to you again next month --

9          MR. LEE:  Very good.

10         THE COURT:  -- in October.  Thank you.

11         MR. GERON:  Very well.  Thank you, Your Honor.

12         MR. HOOVER:  Thank you, Your Honor.  I have no

13  further business with the Court.  May I be excused?

14         THE COURT:  Yes, sir.  Thank you.

15         MR. HOOVER:  Thank you, so much.

16         THE COURT:  Mr. Lee?

17         MR. LEE:  Yes, Your Honor.  That brings us to Item

18  24 on the agenda which is Dawn Prosser's emergency motion for

19  order directing Chapter 7 Trustee to disperse $425,000 to her

20  upon receipt of funds from Mr. Klingerman.  So, again I'll

21  defer to Mr. Geron.

22         MR. GERON:  Your Honor, as I said a little earlier

23  I think this motion is at a minimum, premature.  We don't yet

24  have a recovery from Mr. Klingerman let alone a determination

25  of whether Ms. Prosser has a right to those funds.  There is

1 an issue raised by Ms. Prosser as to -- or an issue raised

2 that is a revisiting of an issue that was prior to

3 termination on a final order that the $200,000 was not, in

4 fact, a right that she had.

5       THE COURT:  Yes, but that was before the trustee

6 decided to limit damages by deducting that sum.

7       MR. GERON:  I understand.  And that's --

8       THE COURT:  So, if the trustee's going to determine

9 that it is property of the estate and part of the contract

10 damages, then it clearly is part of the sale proceeds and

11 she's entitled to her half.

12       MR. GERON:  We understood that and I think we had

13 some comments about that at the last hearing.  The key though

14 at this point is that this is, I think, a reservation of

15 rights.  If I read the motion correctly, this was a

16 reservation of rights, that is, that Ms. Prosser was looking

17 -- I don't want to speak with -- for her counsel.  All I'm

18 saying is at this point this is premature.  We don't yet know

19 what the collection is and therefore we don't yet know what

20 the allocation would be.  If it's a 50/50 allocation as I

21 made some comments last time, we can deal with that, but we

22 don't have the recovery yet to talk about it.

23       THE COURT:  Yes, I understand.  To the extent that

24 you are able to settle something with Ms. Klingerman, please

25 get Mr. Moorehead involved, so that this is a settlement of

**J&J COURT TRANSCRIBERS, INC.**

1  everybody's issue if possible.  If you can only settle with

2  Mr. Klingerman, fine.  But, nonetheless, it seems to me that

3  you ought to try to get this resolved as to Mrs. Prosser as

4  well in terms of whatever her distribution from proceeds may

5  be.  That's what I'm referring to.

6          MR. GERON:  Understood, Your Honor.

7          THE COURT:  All right.  Mr. Moorehead?

8          MR. MOOREHEAD:  Thank Your Honor.  That's

9  understood.  Your Honor, it's not our position --

10         THE COURT:  All right.  So, you simply --

11         MR. MOOREHEAD:  It's not our position that our

12  motion was untimely.  It's our position that regardless of

13  what the Chapter 7 collects from Mr. Klingerman, Dawn

14  Prosser's entitled to $425,000 of that and we just wanted to

15  preserve our position and not be left out in the cold in the

16  event that there was drafting of settlement language for an

17  order and I just filed that emergency motion out of an

18  abundance of caution, Your Honor.

19         And, again, it's our position it does not depend on

20  what the seven collects.  Dawn Prosser's entitled to half of

21  $850,000 which is $425,000.

22         THE COURT:  No, I'm not sure that's correct.  If

23  the damages are settled for an amount that's less, that would

24  essentially be a settlement.  But, I think Dawn Prosser has

25  the right to participate in that settlement.  So, I think you

**J&J COURT TRANSCRIBERS, INC.**

1 all need to participate in settlement discussions if they

2 exist.  If they don't exist, then whatever the damages are

3 that the trustee proves Mrs. Prosser -- and can collect, Mrs.

4 Prosser is entitled to half of them.  If the Trustee only

5 collects half, for example, she's entitled to half because

6 she's entitled at some point to be made whole with her

7 interest in the property, but to the -- it's a 50/50 deal.

8 So, to the extent that the Trustee absorbs half, then Mrs.

9 Prosser would absorb half on a continuing basis until the

10 whole amount is paid.

11          So, you want this --

12          MR. MOOREHEAD:  Our problem with that though, Your

13 Honor, is that the Trustee is giving Mr. Klingerman $200,000

14 credit notwithstanding your order.

15          THE COURT:  No, I just said that to the extent that

16 Mr. -- that the trustee collects and he's already collected

17 the 200,000, she's entitled to her half of the proceeds.  My

18 ruling earlier that indicated that she was not because it was

19 a breach of the bidding procedures contract was based on the

20 fact that the trustee would not be treating that as a

21 deduction from the damages that Mr. Klingerman would owe.

22          But, if the trustee is going to treat it that way,

23 then Mrs. Prosser is entitled to her half, so she's entitled

24 to that -- to half of that $200,000.  I agree with you.

25          MR. MOOREHEAD:  Understood, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  So, you want this carried

2  until I guess next month to see what can be worked out?

3          MR. GERON:  Yes, Your Honor, please.

4          THE COURT:  Mr. Moorehead?

5          MR. MOOREHEAD:  Yes, Your Honor.

6          THE COURT:  All right.  It's continued until

7  October.  Mr. Lee?

8          MR. LEE:  Yes, Your Honor.  Your Honor, the

9  remainder of the agenda, Items 25 through 30, since we took

10  31 which was the insurance motion out of order, all have to

11  do with status conferences on the Chapter 7's avoidance

12  action, so I'm going to turn the podium over to Mr. Geron.

13          THE COURT:  Mr. Geron?

14          MR. GERON:  Back on the record, Your Honor.  This

15  is relatively quick.  Number 25, Your Honor, is Trustee

16  Carroll versus American Express.  That matter is -- let me

17  just before I start that just by way of reminder, these --

18  all the settlements are subject to -- most if not all of them

19  are subject to a joint release or some sort of operative

20  joint release from both estates.  That is, perhaps Mr.

21  Carroll will give an affirmative release and Trustee Springel

22  will not object to a broader release, or perhaps he'll give

23  an affirmative release.  Those details are still to be

24  discussed.

25          But, be that as it may, Trustee versus American

**J&J COURT TRANSCRIBERS, INC.**

1  Express which is Item 25 is settled in principle.

2  Stipulation is to be submitted and the 9019 would be

3  concordant with the inter-estate, that interim settlement of

4  -- that we've been discussing a little earlier today.  So, I

5  would ask that -- I'm sorry.  I would ask that that be

6  carried through to the October date, that is, the next

7  omnibus date and we should hopefully have something

8  substantive for the Court by then.

9          THE COURT:  All right.  It's continued.

10          MR. GERON:  May I go on?

11          THE COURT:  Yes.

12          MR. GERON:  Item 26 is Trustee Carroll versus AIG.

13  The same explanation, this is settled in principle with a

14  stipulation to be submitted with 9019 and we'd ask that it be

15  carried through to the next omnibus.

16          THE COURT:  Okay.  One second.  All right, 26 is

17  continued until the next omnibus.

18          MR. GERON:  Number 27, Your Honor, is Trustee

19  Carroll versus HSBC Bank.  That is the same story and same

20  request.  It is settled in principle and we ask that it be

21  carried so we can dovetail it with the inter-estate issues.

22          THE COURT:  All right, 27 is also continued.

23          MR. GERON:  Twenty-eight is Trustee Carroll versus

24  Sutka, S-u-t-k-a.  That one is the only one where settlement

25  discussions are still underway and I cannot report to the

1   Court yet that that has been settled.  I ask that it be

2   carried because we think it could be productive to do so, so

3   in that instance we're carrying it for further discussions.

4           THE COURT:  All right.  Item 28 is continued until

5   the next omnibus.

6           MR. GERON:  Item 29, Your Honor, is Trustee Carroll

7   versus Global Bank of Commerce.  That matter is -- I may have

8   misstated.  I think that one -- there's also -- there's

9   settlement discussions underway.  I think we're very close on

10  that, but settlement discussions are underway.  I'd ask that

11  it be carried.

12          THE COURT:  Twenty-nine is continued until the next

13  omnibus.

14          MR. GERON:  And then the last matter that I have is

15  Trustee Carroll versus Jillianne Fernandes.  We have not been

16  able to effectuate service on that one and therefore we have

17  filed a notice of dismissal.  I think that just got filed

18  last week, Your Honor.

19          THE COURT:  It was filed.  There's no order

20  attached to it.  It's just a notice of dismissal because it

21  wasn't served, so I'm just going to have the adversary

22  closed.

23          MR. GERON:  Thank you, Your Honor.  That can be

24  removed from the agenda?

25          THE COURT:  Yes.


**J&J COURT TRANSCRIBERS, INC.**

1        MR. GERON:  That concludes my matters, Your Honor.

2        THE COURT:  All right.  Any housekeeping matters?

3        MR. LEE:  Your Honor, I'm unaware of any.  That

4   does conclude the formal agenda.

5        THE COURT:  Okay.  We're adjourned.  Thank you.

6        MR. LEE:  Thank you, Your Honor.

7        MR. GERON:  Thank you, Your Honor.

8                    * * * * *

### C E R T I F I C A T I O N

        We, PAT REPKO, ELAINE HOWELL and AMY L. RENTNER,

court approved transcribers, certify that the foregoing is a

correct transcript from the official electronic sound

recording of the proceedings in the above-entitled matter, to

the best of our abilities.


/s/ Pat Repko                    Date:  September 3, 2009

PAT REPKO


/s/ Elaine Howell

ELAINE HOWELL


/s/ Amy L. Rentner

AMY L. RENTNER

J&J COURT TRANSCRIBERS, INC.


                    **J&J COURT TRANSCRIBERS, INC.**